BETTY CORPORATION & another *vs.* COMMONWEALTH & others.[1]

Middlesex.    March 5, 1968. — May 9, 1968.

Present: WILKINS, C.J., CUTTER, KIRK, & SPIEGEL, JJ.

*Eminent Domain*, Damages, "Special and peculiar" injury. *Way*, Public: closing, nuisance, parking. *Practice, Civil*, Exceptions: renewal of exception; Comment by judge; Dilatory trial. *Evidence*, Opinion: expert.

At the trial of a petition under G. L. c. 159, § 75; c. 79, § 12, for assessment of damages from the abolition of a grade crossing of a railroad and a public way by the erection of barriers crossing the way on both sides of the tracks, a conclusion that the petitioner, a corporation owning buildings abutting the way and land inside the barriers, suffered "special and peculiar" injury not suffered by the public generally and was entitled to damages was warranted where it appeared that the petitioner was deprived of access, even for travel, to its land inside the barriers, that, because of the arrangement of its buildings, maneuvering or backing standard truck box trailers to the door of its loading platform became practically impossible, necessitating immediate changes in the routing of goods through its plant and the building of a new loading platform and door, that such changes

---

[1] The petitioners are the corporate owner and a corporate tenant of premises on Western Avenue, Lowell. Both corporations have the same officers. Each is controlled by members of the same family. It is stipulated that damages are to be assessed as if Betty Corporation were the sole owner and occupant. The respondents are the Commonwealth, the city of Lowell, and the Boston and Maine Railroad (the railroad).

resulted in the loss of useful office space and prevented some use of an alleyway between two buildings, that a relocated spur track cut truck tires, that usual operations at the old loading platform were interrupted for a substantial period of time during the construction of the barriers, and that the petitioner's access to the way was effectively reduced. [317–319]

At the trial of a petition for assessment of damages from the abolition of a grade crossing of a railroad and a public way in a city by the erection of barriers crossing the way on both sides of the tracks, evidence warranted conclusions that before the abolition the petitioner, a corporation owning buildings abutting the way and the fee to the middle thereof, had not exceeded proper bounds in its practices with respect to loading and unloading at its platform box trailers which extended eighteen to twenty feet into the way and were left standing there for as much as two hours, and that no violation of a city parking ordinance by the petitioner barred it from recovery [319–321]; the judge correctly refused to instruct the jury that there was a violation of G. L. c. 90, § 15. [321]

Where, after a trial judge had given the charge and further instructions in response to an excepting party's objections to it, the excepting party made no objection to the amended charge, he was in no position to contend that the further instructions were inadequate. [321]

In the context of a long trial, a comment by the judge interpreted by the respondents as a reproof of their counsel was not of sufficient consequence to require an explanation of it to the jury. [321–322]

Neither an unnecessarily slow pace of a jury trial nor an overnight delay of closing arguments to afford the judge time to study requests for rulings constituted prejudicial error. [322]

After testimony of an expert witness as to the damage suffered by the petitioner in a proceeding had been admitted, much of it without objection or exception, there was no error in the denial of a general motion by the respondent at the close of the trial to strike all such testimony where the record did not support the ground of the motion, that the witness had given undue weight to elements of damage not properly to be considered. [322–323]

PETITION for assessment of damages from the abolition of a grade crossing, filed in the Superior Court on January 22, 1962.

The case was tried before *Barron, J.*

*Charles Ingram,* Special Assistant Attorney General, for the Commonwealth (*William D. K. Crooks, Jr.,* for the Boston and Maine Railroad, & *Cornelius T. Finnegan, Jr.,* City Solicitor, for the city of Lowell, with him).

*Charles F. Barrett* (*Gordon L. Doerfer* with him) for the petitioners.

CUTTER, J. This is a petition to determine the damages caused by a railroad grade crossing elimination. Betty Corporation (Betty) recovered a verdict against each respondent. After a trial which ran from May 12 to June 11, 1965, the jury assessed damages at $60,000. Motions for a new trial were denied on condition that Betty remit $25,000 of the verdict. Betty remitted the required amount. The case is here on an outline bill of exceptions. The long record appendix contains excerpts from a 700 page transcript. The affected area is shown on the annexed sketch plan.

On May 5, 1959, the commissioners of the State Department of Public Works (DPW) by order directed that a railroad grade crossing on Western Avenue, Lowell, be closed to all traffic by placing barriers (see annexed plan at [5] and [9]) on the west and east side of the tracks for the full width of Western Avenue. A spur track to Betty's plant was to be relocated.

Western Avenue (see [7] on plan), prior to the 1959 order, ran approximately east and west across the railroad's two main line tracks (see [6] on plan). The main line tracks crossed Western Avenue at about a thirty degree angle, on a line north of Western Avenue west of the crossing, and south of Western Avenue east of the crossing. A spur track (marked [1] on the plan) ran from a coal or salt storage building (marked [2] on the plan) west to the main line, crossing Western Avenue north of, but very close to, Betty's Building C (marked [3] on the plan) and loading platform (see [4] on plan). This spur track is shown on the plan as relocated a little south of its former route.

Betty's properties (the locus) lie south of Western Avenue. These included a four story brick building, Building A (see [10] on plan), separated on its east side by a dirt drive from a one story wooden building, Building B (see [11] on plan). Both buildings are close to Western Avenue. To the east of Building B was a covered loading platform. A wide door (at [4] on the plan) gave access to this platform from Western Avenue. Immediately south of the platform

was a large four story brick building, Building C (at [3]
on the plan). Other buildings comprising the Betty plant
lie to the south and west of Building C.     All the principal
buildings are interconnected and have the same floor levels.

The loading platform (at [4] on the plan) was used,
prior to the construction under the 1959 DPW order, for
receiving yarns, machinery, and merchandise used in all
the principal buildings. Goods thus received could be taken
about forty to fifty feet to "one of the largest freight
elevators . . . in the entire plant that had access to the
center of all these buildings."

The routing of goods and materials from this loading
platform around the plant, for further processing and for
storage, was described in great detail by Betty's principal
operating official.  The jury on this and other evidence
would have been warranted in concluding that it was a
very significant advantage to Betty, in the orderly and
efficient conduct of operations, to have large trailer trucks
back up to the door of the loading platform (at [4] on the
plan) to deliver goods of various types.

The somewhat conflicting evidence also would have
warranted the jury in reaching the following conclusions:

(1) After the construction of the barriers, it became a
practical impossibility to maneuver or back standard truck
box trailers thirty-five feet long and eight feet wide to the
old loading platform because the westerly barrier was only
twenty-six to thirty feet from the old door (at [4] on plan).
The erection of this barrier necessitated immediate changes
in the routing of goods through the Betty plant.  In 1964
(after developments in other litigation relating to grade
crossing changes had made this possible) Betty built a new,
and probably less satisfactory, loading platform and door at
the northwest corner (at point [8] on the plan) of Building B
(see [11] on the plan) at a cost of about $7,500.  The
changes resulted in the loss of useful office space and pre-
vented some use of the dirt drive or alleyway between
Building A (see [10] on the plan) and Building B (see [11]
on plan).  The moved spur track became an obstacle to

the use of trucks at various loading gates on the locus because the slightly raised tracks cut truck tires.

(2) For a substantial period of time during construction of the barriers, removal of railroad gates, and relocation of the spur track, usual operations at the old loading platform were interrupted.

(3) On the west side of the new westerly barrier (see [5] on the plan), Western Avenue originally was about thirty-five feet wide in front of Buildings A and B. By the barriers the usable area of Western Avenue was effectively reduced, for a distance of about 130 feet of Betty's frontage on the avenue, in an amount varying from thirty-five feet in width (north to south) to zero width. Betty was thus deprived, detrimentally and directly, of much of its principal access to a public way formerly available immediately adjacent to its property. The narrowing of the avenue made of slight, if any, value the remaining access to the northeastern part of the locus. In addition, Betty could be found to have owned the fee north of the locus as far as the center of Western Avenue,[2] as it formerly ran, subject to the city's easement of travel over Western Avenue and subject also to the railroad's easement to cross the area with its tracks. This fee interest of Betty included a triangular area (the general location of which is marked [12] on the plan) north of the westerly barrier. The triangle was supposed to contain about 315 square feet.

1. A major contention of the respondents, presented in various forms, is that there was no compensable taking of,

---

[2] The deed to Betty dated December 28, 1957, described the locus as bounded "NORTHERLY by Western Avenue by several lines measuring 305.21 feet, 101.92 feet, 91.79 feet, 100 feet and 119.19 feet." See *Brassard* v. *Flynn,* 352 Mass. 185, 188–189, and cases cited. The evidence (including plans) indicated that Betty's property extended along Western Avenue for a total distance of 718.11 feet and for 119.19 feet east of a stone bound two feet east of Building A (see [10] on plan). This would bring the easterly end of Betty's property, as bounded by Western Avenue, to a point somewhat east of the east end of the new barrier, or of the portion of it north of the door (at point [4] on the plan) formerly used to reach the old loading platform. From the deeds and plans in evidence, the jury were warranted in concluding that Betty owned the locus, and that, along its whole frontage on Western Avenue, including the area near the new western barrier, Betty owned the fee to the avenue's center line. The trial judge left it to the jury to determine Betty's property lines.

or interference with, Betty's land and property interests. The statute giving a right to damages is G. L. (Ter. Ed.) c. 159, § 75, the relevant part of which is set out in the margin.[3] The practical effect of the 1959 DPW order was to discontinue so much of Western Avenue as lay between the barriers, even if it did not involve actual taking of the fee in such land. The evidence permitted the jury to find not only that Betty was deprived of access, even for travel, to its land within Western Avenue between the barriers (see *Bullard* v. *New York, N. H. & H. R.R.* 178 Mass. 570, 574) but also that it was deprived of reasonable use, in the respects already noted, for trucks of the old loading platform (at [4] on the plan). The jury could also have found that (a) because of the arrangement of buildings on the locus, the deprivation of reasonable truck highway access to buildings B and C caused damage to Betty in a manner, and of a type, wholly different from the injury suffered by the public generally from the discontinuance of a part of Western Avenue, and (b) the damage did not arise merely because Western Avenue became a "dead-end street," but rested in principal part upon the circumstance that reasonable truck access to Western Avenue from the old

---

[3] Section 75 reads in part, "*All damages sustained* by any person in his property by the taking of land for . . . a public way, or *by an abutter thereon by the discontinuance of such public way, to the same extent as damages are recoverable by abutters on ways discontinued by towns,* or by the taking of an easement in land adjoining a public way, shall primarily be paid by the city . . . and all damages caused by the taking of land for the railroad . . . shall primarily be paid by the railroad corporation. Any amount paid by way of damages by the commonwealth or the city . . . or the railroad corporation primarily liable therefor shall be subject to investigation by the department of public works, unless such settlements are assented to in writing by all parties . . . . *If the parties interested cannot agree upon said damages, any party may have the damages determined under*" c. 79 (emphasis supplied). See also G. L. c. 159, § 65 (as amended through St. 1937, c. 270) and § 70 (as amended through St. 1934, c. 357, § 1); *New York, N. H. & H. R.R.* v. *Blacker,* 178 Mass. 386, 390–391. The most relevant provision of c. 79 is § 12 (as amended through St. 1959, c. 626, § 4), which reads, in part, "The damages for property taken . . . shall be fixed at the value thereof before the recording of the order of taking, and in case only part of a parcel of land is taken there shall be included damages for all injury to the part not taken caused by the taking or by the public improvement for which the taking is made . . . . In determining the damages to a parcel . . . injured when no part of it has been taken, regard shall be had only to such injury as is *special and peculiar* to such parcel . . ." (emphasis supplied). Provisions of § 12 for deducting from damages the amount of benefit received by the parcel from the improvement are not here relevant.

loading platform became impossible, an injury "confined only to . . . [Betty's] property . . . [which] cannot be said to be . . . of a general and public nature." See *Webster Thomas Co.* v. *Commonwealth*, 336 Mass. 130, 138. See also *Holbrook* v. *Massachusetts Turnpike Authy.* 338 Mass. 218, 223. The present case involves special, direct, peculiar injury to an important part of Betty's parcels, substantially more intense in its impact on the eastern part of the locus than any inconvenience suffered generally by other members of the public. See *Wine* v. *Commonwealth*, 301 Mass. 451, 458. This circumstance distinguishes this case from *Tassinari* v. *Massachusetts Turnpike Authy.* 347 Mass. 222, 225, and *LaCroix* v. *Commonwealth*, 348 Mass. 652, 657.[4] It could have been found that Betty suffered damage compensable under G. L. c. 159, §§ 70, 75 (see fn. 3), read with the relevant provisions of c. 79. See *Sheehan* v. *Fall River*, 187 Mass. 356, 361 (access to building temporarily "rendered more difficult"); *Cutter* v. *Boston*, 200 Mass. 400, 402.[5] See also *Buck* v. *Great Barrington*, 203 Mass. 372, 375–376.

2. The respondents contend, in effect, that the use made by Betty of its old loading platform (at point [4] on the plan) was illegal, unreasonable, and in violation of statutes (see G. L. c. 90, § 15, as amended through St. 1961, c. 248)[6]

---

[4] In the *Tassinari* case (see p. 225), there was no taking of Mrs. Tassinari's property and no diminution of the convenience of her access from her property to Ferry Street, which had been closed at one end at a point some distance from any part of her property. In the *LaCroix* case, although a small piece of LaCroix's property was taken (see pp. 655, 657), that piece was at such a location as not to interfere in any way (see pp. 653, 656) with LaCroix's access from his land to Howard Road, the street which LaCroix, before and after the taking, used for access to the general highway system.

[5] Portions of the charge directed to whether there had been any "taking" of Betty's property were discussed, after the charge, with the trial judge by counsel. She gave somewhat diffuse further instructions and asked counsel if "that covers it." She received an affirmative reply. See *Duff* v. *Webster*, 315 Mass. 102, 105. There was no exception to the additional instructions, as there was in *Horowitz* v. *Bokron*, 337 Mass. 739, 746.

[6] Section 15 reads in part: "Except as . . . otherwise provided, every person operating a motor vehicle, upon approaching a railroad crossing at grade, shall reduce . . . speed . . . to a reasonable and proper rate before proceeding over the crossing, and shall proceed over the crossing at such rate of speed . . . as is reasonable . . . ." The balance of the section deals with school bus operation and vehicles carrying explosive and inflammable cargo.

and a Lowell traffic ordinance.[7]  There was, indeed, testimony from which the jury could have found that trailers were left standing during unloading operations for as much as two hours, and that, when so standing, they extended as much as eighteen to twenty feet into Western Avenue. Examination of the annexed plan and the exhibits shows that the north end of a thirty-five foot trailer parked perpendicular to the north line of the old loading platform might come to a point about five feet from the south rail of the main line track.  The present western barrier is about eleven feet from the nearest rail.  The distance between freight cars passing in opposite directions on the main line tracks is two feet, which "is considered a safe and adequate distance."  There had been no prosecutions of Betty for alleged traffic violations because of its unloading methods. The police officer on the beat regarded Betty's former practice of backing trucks up to the old loading platform as "a natural thing."

The judge left to the jury the question whether, in all the circumstances, the parking ordinance had been violated by Betty in unloading about two trucks a day, and some loading, at the old platform.  Because of the ordinance exception for unloading, Betty's unloading practices if reasonable, would not have been violations of the letter of the ordinance.  See *Leveillee* v. *Wright,* 300 Mass. 382, 386–387. A member of the general public does not create a nuisance, or act improperly, by standing a vehicle on a public way for a reasonable length of time, without violation of a specific prohibition or interfering "unreasonably . . . with the rights of the public," and in a manner "reasonably necessary for the transaction of business."  See *Loosian* v. *Goudreault,* 335 Mass. 253, 256.  Betty, in addition to the rights of a member of the general public, possessed the rights of an

[7] The Lowell ordinance defines (art. 1) "intersection" as including "any intersection of ways with a railroad," and "parking" as including the "standing of a vehicle . . . otherwise than temporarily for the purpose of and while actually engaged in loading or unloading."  It also provides (art. 5) that "[n]o person shall . . . park" a vehicle in violation of the traffic rules and "in particular at any time" (except with a permit of a type not shown in this case to have been issued to Betty) "[w]ithin an intersection."

abutting owner which could have been found to own the fee under the south side of the traveled portion of Western Avenue. It was open to the jury to conclude that Betty did not exceed proper bounds in its unloading practices prior to the erection of the barriers even if (under the principles of the *Loosian* case, just cited) Betty was in a position successfully to prevent similar action, without its consent, by persons not abutters. The Lowell ordinance, if construed to permit the unloading practice, made a reasonable exception to the general prohibitions of the ordinance. See *Commonwealth* v. *Sargent*, 330 Mass. 690, 692.

The judge's charge with respect to Betty's former unloading practices was sufficiently favorable to the respondents. She instructed the jury that Betty could not recover damages based on the loss of an illegal use. See *Joly* v. *Salem*, 276 Mass. 297, 303. She correctly refused to instruct that there was a violation of G. L. c. 90, § 15 (fn. 6), a statute designed only to require motorists to reduce speed when approaching railroad grade crossings. See *Verrocchi* v. *Boston & Maine R.R.* 322 Mass. 376, 378. The evidence did not show that Betty's unloading practices had created any such hazard as to require the judge to give instructions concerning that hazard and its nature. In any event the failure of the respondents' counsel to renew objections to the charge, after the trial judge had given further instructions in response to objections by them and after their apparent acquiescence in the amended charge (see fn. 5), leaves them now in no position to contend that the further instructions were inadequate. See *Cozzo* v. *Atlantic Ref. Co.* 299 Mass. 260, 268–269; *Duff* v. *Webster*, 315 Mass. 102, 105; *Bloomberg* v. *Greylock Bdcst. Co.* 342 Mass. 542, 551. See also *Herrick* v. *Waitt*, 224 Mass. 415, 417.

3. The respondents contend that the judge during the trial revealed a prejudice against them which prevented the jury from reaching a fair verdict. They interpret as a reproof of counsel a comment by the judge made when counsel for the Commonwealth submitted further requests for instructions (apparently in behalf of all the respondents) just

before final arguments were to begin. This action of counsel seems to have been viewed by the judge as in contravention of some understanding, by the judge and all counsel, that requests would be submitted sufficiently early to enable the judge to study them in advance of the arguments. The incident appears to have been magnified in the respondents' brief to an extent greatly disproportionate to any significance it may have had. In the context of a long trial the judge's remarks seem of slight consequence. See *Charles L. Hazelton & Son, Inc.* v. *Teel*, 349 Mass. 617, 621; *Commonwealth* v. *Leonard*, 352 Mass. 636, 641–642. The impact of the remark was not such that explanation of it to the jury was essential.

The respondents also argue that they were prejudiced by the trial judge's delaying closing arguments (until the next day) to afford her time to study the additional requests. This delay, they say, was in addition to the effect of other delays during trial to which the respondents make reference. After a trial of nearly a month, the jury, indeed, might have been "irked and frustrated" by further delay, as the respondents suggest. The respondents do not persuade us, however, that they were hurt more than Betty was by the particular postponement or by the long proceedings. This trial should have proceeded more rapidly. There should have been greater judicial effort to expedite it. Nevertheless, we cannot say that either the delay in arguments or the unnecessarily slow pace of the trial constituted prejudicial error.

4. There is no merit to an exception to the judge's action in preventing a line of argument by counsel for the Commonwealth on the ground that there was no evidence to warrant the contentions made. The judge, in a somewhat extended bench conference, gave counsel opportunity to point out such evidence, but no such evidence was intelligibly drawn to the attention of the judge.

5. The judge did not err in refusing (on motion by counsel for the Commonwealth which did not specify grounds for the requested action) to strike expert testimony at the

close of the trial. Much of it had been admitted without objection or exception. See *Cummings* v. *National Shawmut Bank*, 284 Mass. 563, 568; *Leonardi* v. *Peabody*, 351 Mass. 706. See also analogy of *Costonis* v. *Medford Housing Authy.* 343 Mass. 108, 116. Cf. *Gazianis* v. *Clinton*, 350 Mass. 758. Although the evidence originally had been admitted de bene, this appears to have been done solely because the witness was taken out of order. There was no clear showing that the witness had given such weight to elements of damage not properly to be considered as would require striking all his testimony. The judge, in any event, charged that the jury could not take these elements into account.

6. Other exceptions have not been argued sufficiently, have not been adequately set out or referred to in the outline bill of exceptions (see S. J. C. Rule 1:22 [2], [8], [10], 351 Mass. 742–745), relate to discretionary matters or to requested instructions adequately given in substance, or are not significant enough to merit discussion.

*Exceptions overruled.*