COMMONWEALTH vs. MELVIN C. LEVY.

No. 89-P-1263.

Norfolk. May 23, 1990. - September 24, 1990.

Present: PERRETTA, DREBEN, & PORADA, JJ.

*Practice, Criminal*, Instructions to jury, Empanelment of jury, Examination of jurors. *Joint Enterprise*.

At a criminal trial the judge's use of a particular hypothetical illustration in his instructions to the jury on the theory of joint criminal enterprise, in the context of the charge as a whole and in the presence of strong identification evidence, did not create a substantial risk of a miscarriage of justice. [282-284]

A judge's use of the word "defendants" rather than "assailants" or "perpetrators," during jury selection in a criminal case, in stating that the case involved "an alleged robbery by two black defendants on two white victims" did not create a substantial risk of a miscarriage of justice. [284-285]

Failure by the judge in a criminal case to question prospective jurors as to presumption of innocence, the defendant's right not to present evidence in his own behalf, and the Commonwealth's burden of proof, as required by G. L. c. 234, § 28, did not amount to reversible error in the absence of any proof of prejudice to the defendant. [285-288]

INDICTMENTS found and returned in the Superior Court Department on January 14, 1987.

The case was tried before *Roger J. Donahue*, J.

*Peter M. Onek*, Committee for Public Counsel Services, for the defendant.

*James F. Lang*, Assistant District Attorney, for the Commonwealth.

DREBEN, J. In his appeal from convictions of unarmed robbery and assault with intent to rob, the defendant, Melvin Levy, makes three claims: 1) the trial judge in his instructions on joint venture charged the jury on a theory of guilt neither grounded in the evidence nor argued by the parties; 2) in questioning prospective jurors during empanelment, the

judge improperly used the word "defendants" in stating that the case involved "an alleged robbery by two black defendants on two white victims"; and 3) the judge failed to follow, when requested, the requirements of G. L. c. 234, § 28. We affirm.

The jury were warranted in finding the following facts. Two victims, Richard Archuleta and Tom McDonald, were attacked on Longwood Avenue in Brookline by three men in the early hours of September 13, 1986. Archuleta was robbed, and an attempt was made by one of the assailants to reach into McDonald's pocket where he kept his cash. After the attack, which lasted two or three minutes, the three men fled on foot toward Beacon Street. Officer Mulligan of the Boston police department, who happened to be nearby, saw the scuffle and then observed three men running toward him. One of them was the defendant.

Boston and Brookline police came upon the scene and were given a description of the men by McDonald. At trial, although the officers gave different accounts of how the defendant was stopped while driving,[1] they agreed that he was stopped by the Brookline police, that McDonald was brought to the place where the defendant was detained, and that McDonald identified the defendant as one of the assailants. McDonald was "very certain" of his identification.

At trial, McDonald testified that one of the assailants, a black man, the tallest of the three, was well built, had a short "afro" and a light beard, and was wearing a dark blue sweater with the letters F-I-L-A on the front. The defendant, when stopped by the Brookline police, fit that description and wore a black sweatshirt with the letters F-I-L-A across the front.

---

[1]Officer Mulligan testified that, after seeing the scuffle and the men run to a black car, he flagged down a Brookline police cruiser and told the officers to stop the car and hold the driver. Officers of the Brookline police, however, testified that they stopped the car when they saw it make an illegal U-turn; they said it was only *after* they had stopped the defendant that Officer Mulligan walked over to them and told them that the driver was involved in a fight down the street.

The car in which the defendant was stopped was registered to Nathaniel Williams. Williams was apprehended later that morning and was subsequently identified by McDonald both in October, 1986, and at a preliminary hearing in December in the Brookline District Court.[2] McDonald also identified the defendant on those occasions.

Williams and the defendant were tried together. Each was charged with unarmed robbery of Archuleta and assault with intent to rob McDonald. There was evidence that the defendant had held Archuleta from behind while the third assailant punched him and that Williams had assaulted McDonald. The Commonwealth's theory was that the three assailants had been acting in concert in furtherance of a common purpose to rob both victims.

In closing argument, the defendant claimed mistaken identification and, based on certain testimony of Brookline police officers,[3] argued that the defendant was in a car at the time of the attack:

> "If Mr. McDonald was mistaken in his identification of [Willie Williams], isn't it possible, given the circumstances of this fight and his state of mind, that he could have been mistaken in his identification of Melvin Levy, Melvin Levy whom you know was in a car talking to the Brookline police when the Brookline police were told there is a fight in progress, Melvin Levy who, if he was in the car and in the presence of Officers Ward and O'Leary, could not possibly have been down at the scene of this crime and could not possibly have laid a finger on anyone, especially not Mr. Archuleta."

---

[2]At the preliminary hearing, McDonald misidentified Williams's brother as one of the assailants (the brother was overseas at the time of the incident), but McDonald had indicated he was less sure of that identification than he was of the other two assailants.

[3]While the defendant was detained in the car by Brookline police officers, but before McDonald had been brought to identify him, four women in a vehicle came up to the officers saying, "There's a fight down around the corner. Better get down there fast." The women were never identified or questioned.

1. *Jury instruction on joint venture.*

In his charge, the judge accurately instructed the jury on the theory of joint criminal enterprise. To illustrate the legal principles involved, the judge used an example of a bank robbery. The illustration and some relevant portions of the charge are set out in the appendix to this opinion. The defendant objected, claiming that it gave the jurors an alternative theory of guilt that had not been before them during the trial, namely, that the defendant could be guilty as a "getaway" driver even if he had not been at the scene of the incident. The judge gave a supplemental instruction,[4] to which the defendant raised no objection.

The defendant now contends that the judge's supplemental instruction did not cure the harm, and that the hypothetical permitted the jury to convict him as a joint venturer even if they believed he was in a car during the attack. He claims that the evidence was insufficient to warrant an instruction based on the defendant's role as a "getaway" driver, that the judge exacerbated the problem by not foreclosing the possibility that the joint criminal enterprise was still in progress while the defendant was sitting in a car,[5] and that the hypothetical was particularly prejudicial, in light of the defendant's "alibi" defense.

In the context of the charge as a whole, *Commonwealth v. Carrion*, 407 Mass. 263, 270 (1990), and the strong identification evidence of McDonald and Officer Mulligan, the example, while perhaps in retrospect unwise, did not, we con-

---

[4]"When I gave the jury an example of joint criminal enterprise and I used the example of a robbing of a bank, I did not mean to emphasize in any way the fact that a car was used. What I was emphasizing was that a person does not have to be involved in every act with another defendant in a joint criminal enterprise. If the jury finds there is a joint criminal enterprise, each person is responsible for the acts of the other."

[5]In his original instructions, the judge told the jury that "a joint criminal enterprise has a beginning and an ending and, of course, you the jury must determine when the joint criminal enterprise, if any, began and when it ended. I think it is fairly obvious, whoever you find to be involved, as to what the beginning and ending was." Later, in response to a question from the jurors on another point, he told the jury that "when the joint criminal enterprise ends, . . . the acts of one are no longer the acts of the other."

clude, create a substantial risk of a miscarriage of justice.[6] A trial judge may choose the form of expression best adapted to make the law intelligible to jurors, *Commonwealth v. Silva*, 388 Mass. 495, 507 (1983), and may illustrate the law using a hypothetical situation. See *Commonwealth v. Thurber*, 383 Mass. 328, 332-333 (1981). Compare *Commonwealth v. Benders*, 361 Mass. 704, 708 (1972).

Both before and after the hypothetical, the judge reminded the jury that he was not talking about the facts of this case, and, in response to the defendant's objection, pointed out that the purpose of the hypothetical was not to emphasize the use of a car. Moreover, after a query from the jury,[7] the judge gave the following additional instruction:

> "So if you found that one defendant actually punched one of the victims and you found the defendants to be part of a joint criminal enterprise, then that punching would be the act of the other defendant. . . . If this was a joint criminal enterprise and if one defendant held a victim, that would be the act of the other also, in other words, acting jointly toward a common criminal purpose."

We do not think the jury were misled by the hypothetical. At no time did the prosecutor argue that the defendant's role was to assist an escape. Both the prosecutor's opening and closing arguments described a venture in which three assailants set upon two victims at the same time. McDonald's powerful identification of the defendant, including the telltale lettering on his sweater, put the defendant at the scene

---

[6]Because the defendant did not renew his objection after the judge gave the supplemental instruction our review is confined to whether the instructions as a whole created a substantial risk of a miscarriage of justice. See *Betty Corp. v. Commonwealth*, 354 Mass. 312, 321 (1968); *Commonwealth v. Barbosa*, 399 Mass. 841, 844 (1987); *Commonwealth v. Kelley*, 21 Mass. App. Ct. 912, 914 (1985); *Commonwealth v. McMaster*, 21 Mass. App. Ct. 722, 730-731 (1986); Mass.R.Crim.P. 24(b), 378 Mass. 895 (1979).

[7]The jury wanted to know how to word the verdict to reflect a joint criminal enterprise.

of the incident as a direct participant in the attack on Archuleta. That attack appeared to be coordinated with a concomitant assault on Archuleta's companion, McDonald. In convicting both men of both crimes, we think it highly unlikely that the jury were led by the judge's hypothetical to convict the defendant on the basis that he was waiting in the car.

2. *References to the assailants as "defendants" during jury empanelment.*

At the defendant's request, the judge individually screened the prospective jurors for racial bias. See G. L. c. 234, § 28, second par. In most instances, the judge worded his inquiry as follows: "This case involves an alleged robbery by two black defendants on two white victims. Would this alleged incident cause you any problem in reaching a fair and impartial verdict based only on the evidence?" The judge in several instances used the words "by two black defendants that I introduced to you earlier." The judge had previously introduced the defendants to the jurors to find out if any of them knew the defendants. When the empanelment was completed, counsel for both defendants said they were content.

For the first time, on appeal, the defendant claims that the judge's use of the word "defendants" rather than "assailants" or "perpetrators" enhanced the prosecution's case "by informing all fourteen eventual jurors during voir dire that the defendants were actually the assailants." We see nothing in the judge's questions suggesting a belief on his part that the defendants were actually the assailants. In any event, in the absence of an objection, we review the empanelment procedure only to determine whether there was a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Barrows*, 391 Mass. 781, 783 (1984). The word "defendant" is the customary and appropriate term for a person charged with a crime, and does not convey any belief that the person is guilty. In the absence of a showing that the use of the term caused a particular prejudice or weakened the defendant's

case in some significant way, the claim that the term was improper borders on the frivolous.[8]

3. *Failure of judge to ask prospective jurors statutory questions.*

General Laws c. 234, § 28, set forth in the margin[9] requires the judge upon request to include questions about presumption of innocence, the defendant's right not to present evidence in his own behalf, and the Commonwealth's burden of proof.[10] Smith, Criminal Practice & Procedure § 1708 (1990 Supp.).

Prior to empanelment, the defendant filed a motion requesting the judge to ask the statutory questions of each juror individually. The judge did not do so, but the defendant

---

[8]No showing of prejudice or a weakening of the defendant's case has been made. During each voir dire, the judge used the terms "alleged robbery" and "alleged incident." He instructed the jury at the beginning and at the end of the trial on the presumption of innocence and the Commonwealth's burden of proof. Moreover, the context in which the term was used — an inquiry as to the prospective juror's ability to reach a fair and impartial verdict based on the evidence alone — belies the claim made in the defendant's brief that the judge "announced his own view."

[9]The statute, as amended through St. 1985, c. 463, provides in pertinent part:

> "Upon motion of either party, the court shall, or the parties or their attorneys may under the direction of the court, examine on oath a person who is called as a juror therein, to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein; and the objecting party may introduce other competent evidence in support of the objection. If the court finds that the juror does not stand indifferent in the case, another shall be called in his stead. *In a criminal case such examination shall include questions designed to learn whether such juror understands that a defendant is presumed innocent until proven guilty, that the commonwealth has the burden of proving guilt beyond a reasonable doubt, and that the defendant need not present evidence in his behalf. If the court finds that such juror does not so understand, another shall be called in his stead.*" The material in italics was added in 1985.

[10]Massachusetts Rule of Criminal Procedure 20(b)(1), 378 Mass. 889 (1979), is similar to G. L. c. 234, § 28, except that the rule mandates examination even in the absence of a request by counsel. The rule does not contain the questions added to § 28 by the 1985 amendment. See note 9, *supra.*

neither objected nor brought the omission to the judge's attention.

We reject the defendant's claim that the error is cause for reversal. Even when an objection is taken, a statute, G. L. c. 234, § 32, "providing that no irregularity in the jury empanelling process shall be sufficient to set aside a verdict unless the objecting party has been injured or has objected before the verdict, requires some proof of prejudice . . . ." *Commonwealth* v. *Campbell*, 394 Mass. 77, 84 (1985). In *Campbell*, the court held that the selection of a foreperson in an irregular manner required a showing of prejudice although the defendant had duly objected. *Id.* at 83-84.

In *Commonwealth* v. *Fudge*, 20 Mass. App. Ct. 382, 388-389 (1985), we characterized the failure of the judge to make specific inquiry of the venire as to relationship, interest, opinion, bias, or prejudice, as required by Mass.R.Crim.P. 20(b)(1), 378 Mass. 889 (1979), as a "mere irregularity" which was waived by the defendant when he failed to file a motion entitling him to the statutory questions (G. L. c. 234, § 28) or to object to the deficiencies under rule 20(b)(1). We also pointed out in *Fudge* at 389, citing G. L. c. 234, § 32, "Even if the defendant had objected to the empanelling process, he has not shown that he 'has been injured thereby.' " *Fudge* thus disposes of the defendant's claim, even though in the present case, unlike *Fudge*, the defendant filed a motion under G. L. c. 234, § 28.

We are buttressed in this conclusion by the requirement that there be a showing of prejudice even when the safeguards at stake are more important than the defendant's right to the statutory questions of § 28. In *Commonwealth* v. *A Juvenile (No. 2)*, 396 Mass. 215, 223-225 (1985), where the judge erred in failing to conduct a colloquy with the defendant before granting a motion of defendant's counsel for race-related questioning of prospective jurors, the Supreme Judicial Court noted, "[O]rdinarily, . . . the deprivation of a statutory right is not grounds for reversal unless the defend-

ant can demonstrate resulting prejudice.[11] [Citation omitted.] The defendant, therefore, must show that the error 'possibly weakened his case in some significant way so as to require a new trial' " (citation omitted). *Id.* at 224. Both in *Commonwealth* v. *A Juvenile (No. 2), supra* at 224-225, and in *Commonwealth* v. *Rivera,* 397 Mass. 244, 251-252 (1986), where the same omission occurred, the court's focus was whether the guilty verdict was attributable to the strength of the Commonwealth's case, rather than to any animosity toward the defendant which might have been created by the race-related voir dire questioning.

The right at stake here — to examine a juror's understanding of constitutional principles — like the right in *Commonwealth* v. *A Juvenile (No. 2),* is not constitutionally based. *Commonwealth* v. *Rhoades,* 379 Mass. 810, 821 (1980). *Commonwealth* v. *Mahoney,* 406 Mass. 843, 851 n.6 (1990). Applying an analysis similar to that applied in *Commonwealth* v. *A Juvenile (No. 2), supra* at 224-225, and in *Commonwealth* v. *Rivera, supra* at 251-252, cases in which the potential injury to the defendant was more palpable, see *Commonwealth* v. *A Juvenile (No. 2), supra* at 223, we conclude it highly unlikely that the judge's failure to ask the statutory questions was a factor in the verdict. Before the introduction of evidence, the judge instructed the jury on the presumption of innocence and the Commonwealth's burden of proof beyond a reasonable doubt. He reiterated these principles during his final charge and explicitly instructed the jury that "the defendant in a criminal case has no burden of proving his innocence and the defendant is under no obligation to testify or present any evidence whatsoever." In addition, the questions the judge asked during empanelment elicited the prospective jurors' understanding that a defendant's conviction must be based only on the evidence at trial. As discussed earlier, the evidence of the defendant's guilt was

[11]Although a colloquy with the defendant is no longer required, *Commonwealth* v. *Ramirez,* 407 Mass. 553, 556-557 (1990), there is no doubt that at the time of *Commonwealth* v. *A Juvenile (No. 2), supra,* the direct participation of the defendant was considered an important safeguard.

powerful, if not overwhelming. Although there were some inconsistencies in the testimony of some of the Commonwealth's witnesses, these related primarily to insignificant details. In light of the evidence, it is difficult to imagine how the asking of the requested questions would have made a difference.

*Judgments affirmed.*

APPENDIX.

*Portion of Judge's Charge on Joint Enterprise.*

"Now, to be engaged in a joint criminal enterprise, a person must actually participate in it; that is, he must take some part in it. If you are talking about a robbery and an assault, a person must take some part in it involving one victim or the other or both. Merely being present at the time a crime is committed is not enough even though a defendant may have knowledge that the crime was to be committed and did nothing to prevent it.

. . .

"To sustain a conviction on the theory of joint enterprise, the defendant must be shown to have shared the mental state required for the crime and to have assisted the principal intentionally in its commission.

"There must be proof that the defendant somehow participated in committing the offense by counseling, hiring or otherwise procuring the principal, by agreeing to stand by, at or near the scene to render aid, assistance or encouragement if it became necessary or to assist the perpetrator in making an escape from the scene of the crime. . . .

"Now, the defendants are charged with the crimes of assault with intent to rob and unarmed robbery *but to get away from the scene of what is alleged to have occurred on September 13, 1986* [emphasis added], and to give you an example of joint criminal enterprise, let me say this:

"Suppose you have three people who plan to rob a bank. They drive up to the bank. One person is behind the wheel of the car and stays in the car. The other two persons go into the bank and hold up the teller at gunpoint and, at some time during the course of what takes place in the bank, one of those persons that is robbing the bank shoots the teller or perhaps the security guard. The person in the car knows that his companions are going into the bank to rob the bank and that they are armed. That being the case, that person in the car, even though he never fired a shot and never carried a gun and never went into that bank and injured anybody, can be

charged with armed robbery and can be charged with the shooting of that particular person and, if that particular person in the bank dies, can be charged with a homicide because he is involved in a joint criminal enterprise.

"And that is an example of what a joint criminal enterprise is, *taking it away from the circumstances of this case* [emphasis added].

"And what the government is alleging in this case is that these two defendants, Mr. Levy and Mr. Williams, joined in or participated in a criminal venture with a third party, that each joined the enterprise with the knowledge that it was criminal in nature or had a criminal objective, that each had a specific criminal intent or a shared criminal intent to join in and participate in a joint criminal venture and that after they joined this criminal enterprise, each defendant, Mr. Levy and Mr. Williams, were involved in the crimes charged, one or both, that were committed and that each of them committed some act in furtherance of that enterprise. And you may make a judgment, of course, individually on each charge, whether on the robbery itself or the assault with intent to rob, whether that was a part of the joint enterprise and whether Mr. Levy or Mr. Williams committed some act in furtherance of that enterprise.

"And if you find that that exists, that there was a joint criminal enterprise, that each had a specific criminal intent to join in the enterprise, which must be established by the evidence, of course, and that one or the other committed some act in furtherance of that enterprise, then the acts of one become the acts of the other once that joint criminal enterprise exists, and one can be charged even though one has not actually committed, let us say, the actual assault. But, if it is a joint criminal enterprise, the other can be charged with the same crime, assuming you find to a point beyond reasonable doubt all of the essential elements I have given you of the crime or crimes charged."