COMMONWEALTH *vs.* DAVID A. TALBOT.

No. 91-P-429.

Berkshire. December 8, 1992. - January 13, 1994.

Present: SMITH, FINE, & IRELAND, JJ

*Homicide. Joint Enterprise. Practice, Criminal,* Instructions to jury, Argument by prosecutor, Deliberation of jury, Interrogation of jurors, New trial. *Evidence,* Photograph. *Jury and Jurors.*

At a criminal trial, the evidence both at the close of the Commonwealth's case and at the close of all the evidence was sufficient to permit the jury to conclude beyond a reasonable doubt that the defendant had engaged in a joint venture with another individual to murder the victim and steal her automobile. [767-775]

At a criminal trial, the judge's instructions to the jury made clear that, in order to convict the defendant as a joint venturer, there must be sufficient evidence demonstrating that the defendant was present at the commission of the crime with the necessary intent and knowledge and that he aided or assisted in the commission of the crime in some manner; the judge was not required to give the defendant's requested instruction on the crime of being accessory after the fact. [775-777]

At the trial of a murder indictment, the judge did not abuse his discretion in admitting in evidence photographs of the victim's body, which were relevant to whether the crime had been committed with extreme atrocity or cruelty. [778]

At a criminal trial, the prosecutor's closing argument did not exceed the limits of propriety. [778-779]

A criminal defendant was not entitled to a new trial on the ground that the foreperson of the jury had allegedly sought to discuss the case with a lawyer during a weekend recess in the jury's deliberations, where, when the jury reconvened, the defendant effectively waived his right to have inquiry made of the jurors concerning any extraneous influence and where, in any event, nothing before the judge indicated that any extraneous information had reached the jury. [779-781]

INDICTMENTS found and returned in the Superior Court Department on September 12, 1988.

The case was tried before *William W. Simons,* J., and a motion for a new trial was considered by him.

Commonwealth *v.* Talbot.

*William J. Fennell* for the defendant.

*Anne M. Kendall,* Assistant District Attorney, for the Commonwealth.

SMITH, J. The defendant, David A. Talbot, and another individual, Patrick M. Burke, were indicted for the crimes of murder in the first degree and larceny of a motor vehicle. They were tried separately. A jury convicted Burke on both indictments.[1] In a later trial the defendant was convicted by a jury of murder in the second degree and larceny of a motor vehicle. On appeal, the defendant has raised several issues, which we discuss below.

1. *Denials of the defendant's motions for required findings of not guilty.* At the close of the Commonwealth's case and again at the close of all the evidence, the defendant moved for required findings of not guilty on both indictments. On appeal, he claims the judge's denial of these motions was error.

· "The essential question in evaluating the denial of a motion for a required finding of not guilty is whether the evidence received, viewed in a light most favorable to the Commonwealth, is sufficient so that the jury 'might properly draw inferences, not too remote in the ordinary course of events, or forbidden by any rule of law, and conclude upon all the established circumstances and warranted inferences that the guilt of the defendant was proved beyond a reasonable doubt.' *Commonwealth* v. *Vellucci,* 284 Mass. 443, 445 (1933)." *Commonwealth* v. *Stewart,* 411 Mass. 345, 349-350 (1991), quoting from *Commonwealth* v. *Clary,* 388 Mass. 583, 588-589 (1983). We consider the state of the evidence, in the light most favorable to the Commonwealth, at the close of the Commonwealth's case and at the close of all the evidence. *Commonwealth* v. *Anderson,* 396 Mass. 306, 311 (1985). *Commonwealth* v. *Cordle,* 412 Mass. 172, 173 (1992).

We summarize in some detail the evidence presented by the Commonwealth in its case-in-chief. Early in the evening

---

[1]Burke's convictions were affirmed in *Commonwealth* v. *Burke,* 414 Mass. 252 (1993).

of August 30, 1988, the victim left her home in Dalton, driving her automobile, a light blue A.M.C. Spirit, and taking her license and a ten dollar bill in her pocketbook. She also owned a small pocket knife.

Later that evening, the victim appeared at a bar in Pittsfield where she spent some time talking with a regular customer. At about 11:00 P.M., the defendant and Burke entered the bar. Burke sat on the stool beside the victim; the defendant sat next to Burke. Burke engaged her in conversation. The bartender overheard him tell the victim that he liked her. At some time, the defendant told the bartender that they were out of money; the bartender bought both of them a beer. The two men had four or five beers each. After the bartender announced "last call" at about 12:45 A.M., she noticed that the victim, the defendant, and Burke had left the bar. All three were sober, according to the bartender. The victim was not seen alive again.

Between 2:00 and 3:00 A.M. on August 31, the defendant and Burke arrived unannounced at the West Springfield apartment of a relative of the defendant. The two men did not appear to be "drunk." The defendant had on a shirt and jeans, and was wearing cowboy boots. Burke was dressed similarly but was wearing sneakers. Burke's jeans were ripped around the knees. While at his relative's house the defendant borrowed money and a shirt from him. When asked where he had been, the defendant replied that he and Burke had been in a fight with a man in Springfield.

After leaving West Springfield that morning, the defendant and Burke drove to Leominster in the victim's automobile to the home of Karen Mayfield, looking for Jean Broughey, a friend of Burke. They arrived at the Mayfield house at about 9:00 A.M. The defendant was wearing a new pair of dark blue jeans, a dungaree shirt and gray cowboy boots. Burke was disheveled, wearing a white sweat shirt, torn dungarees and sneakers. Mayfield noticed that there were blood stains on Burke's jeans. When Mayfield commented to Burke on how bad he looked, the defendant replied: "At least I had the decency to change."

Mayfield accompanied the defendant and Burke to Broughey's house. They arrived at about 10:00 A.M. In response to questions from Broughey about where they had obtained the automobile they were driving, the defendant and Burke gave several contradictory answers, none of which made reference to the victim. They said that they had bought the vehicle for $50, that it belonged to the defendant's girlfriend, and then that it belonged to her daughter. Finally, the defendant stated that they had taken the automobile, while hitchhiking, from a man whom they stabbed and a woman whom they had thrown out of the car. When Broughey asked Burke if he could do something like that, the defendant said: "He couldn't, but I could."

Later that day, the defendant, Burke, Broughey, and Mayfield drove to Marlborough to the home of Robert Wallace. En route, both Mayfield and Broughey noticed blood on the windshield. The defendant took a sponge, moistened it with vodka, and wiped the blood off the windshield, saying: "Well, we have to get rid of this."

At the Wallace home, the group drank vodka that Broughey had brought from her house. At one point, unbeknownst to the others, Burke left the Wallace home in the victim's automobile. He was stopped by the police while walking along a street and placed in protective custody because he appeared to be intoxicated. Broughey and Wallace's wife went to the Marlborough police department to bring him home. Burke informed them that he had lost the automobile, which still contained Broughey's purse and the defendant's boots. Later, after an argument with Burke, Broughey and Mayfield left the Wallaces'.

As a result of a telephone conversation, Irene Hillard, a friend of the defendant, picked up the defendant and Burke in Marlborough and drove them to her home in Pittsfield where they stayed for the next few days. During that time, Hillard's daughter asked Burke about cuts he had on his hands. Burke told her that he had left a girl in some woods and also threw a knife into the woods. During that same period, the defendant called Broughey and told her to report to

the police that her pocketbook had been stolen. Broughey told him that she was afraid of both Burke and him and did not want to talk to them anymore.

On Saturday, September 3, 1988, at about 11:30 A.M., the Marlborough police found the victim's automobile, parked upon a sidewalk in that town. In the automobile were Broughey's missing purse and the defendant's cowboy boots. The police noticed dry bloodstains on the passenger side and also in the rear of the hatchback. The automobile was towed to the police station where it was examined by a police chemist and a fingerprint expert.

The chemist found blood stains on the automobile's exte-'rior, along the passenger side from the windshield to the hatchback. She found blood stains throughout the interior of the vehicle. The chemist noted that the seats had been wiped off, but blood had soaked into the foam padding of the seat.

The defendant's boots, found in the automobile, also had blood on them. The blood was type A, the same blood group as the victim's. The defendant had type B blood; Burke had type A. Other items of evidence removed from the victim's car tested positive for type A blood as well. The defendant's palm print was found on the hatchback window, behind the driver's side, on the outside of the vehicle.

As a result of finding Broughey's purse, the police telephoned her on Saturday and reported their discovery. Broughey told the police that the defendant and Burke had taken the purse. Later, sometime between 8 and 9:00 P.M., the defendant and Burke left Hillard's home in her automobile. Within a few minutes, members of the Massachusetts State police arrived at Hillard's home looking for the defendant and Burke. The next day, the defendant called Hillard who told him that the police were looking for him.

On September 4, 1988, the victim's body was discovered by a tracking dog approximately seventy-five feet up a hill from Route 20, buried under several inches of dirt, leaves,

and sticks. Her white jean jacket, stained with blood, was found in the woods.[2]

An autopsy revealed that the victim had died from multiple stab wounds, strangulation, and blunt force injuries. The blunt force trauma resulted in hemorrhage in the sternum area and fractured ribs on both sides of her body. The medical examiner testified that "it would have taken considerable force to have fractured ribs in the back of the individual and in the front." The fracture of the ribs was consistent with "kicking or stomping." Blunt force caused an accumulation of blood in the chest area, a laceration of the lung deep inside the chest, diffuse hemorrhage in the upper abdominal area, and fractures of her nose and her lower jaw which "literally separated." Three of her teeth were knocked out. Blunt force trauma to her head caused severe hemorrhaging.

The autopsy also revealed twenty-two stab wounds in a limited area along the middle to lower area of the victim's left breast. The doctor testified that the nature of the wounds indicated that the victim was not moving at the time they were inflicted. The small pocket knife found in the rest area was capable of inflicting these wounds. All the injuries — the strangulation, the blunt force trauma, and the stab wounds — were inflicted in the same period of time, within several minutes.

On September 5, 1988, police officers in Ipswich spotted the defendant and Burke in Hillard's car. When the vehicle pulled into the breakdown lane, the defendant and Burke ran from the car. Within twenty minutes, the defendant was found, hiding in a stream, and he was arrested. Upon arrest, the defendant gave the officers a false name.

It was the Commonwealth's theory at trial that the defendant was engaged in a joint venture with Burke to murder the victim and steal her automobile. To support its theory the

[2]Early on the morning of August 31, 1988, a motorist had found a tire iron, some sticks with blood on them, and a pool of blood in a rest area off Route 20 in Hancock. State police found a blue car mat, which matched those from the victim's car, splattered with blood in the woods adjacent to the rest area. They also found a small knife, identical to the one the victim owned, with blood on the open blade.

Commonwealth relied on circumstantial evidence. "A conviction may be properly based entirely on circumstantial evidence so long as that evidence establishes the defendant's guilt beyond a reasonable doubt." *Commonwealth* v. *Martino*, 412 Mass. 267, 272 (1992). *Commonwealth* v. *Woods*, 414 Mass. 343, 354 (1993). Where "the evidence is largely circumstantial, 'it is not essential that the inferences drawn should be the only necessary inferences . . . . It is enough that [the inferences] be reasonable and possible.' " *Commonwealth* v. *Martino*, 412 Mass. at 272, quoting from *Commonwealth* v. *Merrick*, 255 Mass. 510, 514 (1926).

"A joint venturer, is 'one who aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime.' " *Commonwealth* v. *Stewart*, 411 Mass. at 350, quoting from *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). The test for joint venture is whether the defendant was (1) present at the scene of the crime, (2) with knowledge that Burke intended to commit a crime or with intent to commit the crime, and (3) by agreement was willing and available to help Burke if necessary. *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980). *Commonwealth* v. *Mandile*, 403 Mass. 93, 99-100 (1988). "A person's knowledge or intent is a matter of fact, which is often not susceptible of proof by direct evidence, so resort is frequently made to proof by inference from all the facts and circumstances developed at the trial." *Commonwealth* v. *Casale, supra.*

Viewing the evidence in the light most favorable to the Commonwealth, we conclude that there was sufficient evidence to satisfy the jury that the defendant and Burke were engaged in a joint venture to murder the victim and steal her car.

The defendant and Burke were seen in the company of the victim at a bar in Pittsfield — the last time she was seen alive. A few hours later the defendant and Burke were in possession of the victim's automobile. The defendant and Burke gave contradictory versions of the manner in which they obtained possession of the automobile. Blood stains

matching the victim's blood type were found throughout the automobile. The defendant's palm print was found on the hatchback window of the automobile.

Many of the blunt force injuries, one of the three causes of the victim's death, were consistent with the victim being kicked or stomped. There was evidence that the defendant was wearing cowboy boots; Burke was wearing sneakers. The defendant's boots had the victim's blood type on them. A jury could reasonably infer that the victim's injuries were consistent with being kicked or stomped by the defendant's boots rather than Burke's sneakers.[3]

Also, from the evidence of the defendant's statements and conduct during the relevant period, the jury could reasonably infer that the Commonwealth had proved all the essential elements that make up a joint venture. When Burke was observed with blood stains on his clothes, the defendant stated, "At least I had the decency to change." The defendant also indicated that he was more capable of violence than Burke and that he could stab a man and throw a woman out of an automobile. The defendant wiped blood off the windshield of the victim's automobile saying, "Well, *we* have to get rid of this" (emphasis added). There was also evidence that the defendant and Burke attempted to evade capture by the police and that upon arrest the defendant gave a false name.

We recognize that "[t]he line that separates mere knowledge of unlawful conduct and participation in it, is 'often vague and uncertain. It is within the province of the jury to determine from the evidence whether a particular defendant [has] crossed that line.' " *Commonwealth* v. *Cerveny*, 387 Mass. 280, 287 (1982), quoting from *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 250 (1971). "To the extent that conflicting inferences are possible from the evidence, 'it is for the jury to determine where the truth lies.' " *Common-*

[3]Indeed, the evidence concerning the victim's injuries and the defendant's footwear coupled with other evidence "was sufficient to implicate the defendant as a participant in the [murder] of the victim and thus to warrant his conviction either on the theory that he acted as a principal in the murder or that he acted as a joint venturer." *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 511 n.12 (1992).

*wealth* v. *Wilborne,* 382 Mass. 241, 245 (1981), quoting from *Commonwealth* v. *Amazeen,* 375 Mass. 73, 81 (1978).

In sum, the evidence at the close of the Commonwealth's case, read in a light most favorable to the Commonwealth, was sufficient to satisfy a rational trier of fact as to all the elements of a joint venture. The judge did not commit error in denying the defendant's motion at the conclusion of the Commonwealth's case.

Because the defendant filed a motion for a required finding of not guilty at the close of all the evidence, "[w]e consider the evidence at [that stage] to determine whether the Commonwealth's position as to proof had deteriorated since it had closed its case." *Commonwealth* v. *Basch,* 386 Mass. 620, 622 n.2 (1982).

It was the theory of the defense that the defendant was not present at the time the murder was committed by Burke, nor did he otherwise participate, in any way, in that crime. Rather, the defendant claimed that Burke, after committing the murder alone, drove the defendant to the scene to help Burke dispose of the body and that the two men then left the scene together.

To support his theory, the defendant testified as follows. On August 30, 1988, the defendant and Burke were staying at the home of Irene Hillard in Pittsfield. On the evening of August 30, the defendant and Burke started out in Hillard's automobile to visit the defendant's relative living in West Springfield. They were stopped by the police because of a missing headlight, and, because neither the defendant or Burke had a license or registration, the police ordered the automobile to be towed back to Hillard's house.

The defendant and Burke rode back to Hillard's house in the tow truck. After an argument with Hillard's daughter about the automobile, the defendant and Burke left the house and began walking toward Hillard's son's house in order to obtain a ride to West Springfield. On their way, they passed a bar and went inside. The victim, whom they did not know, was in the bar.

After the defendant, Burke, and the victim left the bar, Burke and the victim drove off in the victim's automobile. The defendant was drunk, and, after searching in vain for an empty automobile in which he could sleep, he returned to the bar's parking lot where he fell asleep. He woke up when Burke drove into the lot in the victim's automobile. Burke told the defendant to get into the automobile. Once inside, the defendant noticed that blood was on Burke's face and covered his arms and pants. Burke told the defendant that he had killed the victim and then drove the defendant to the wooded area where he had left the body. The defendant helped Burke move the body to the area where it was eventually found. The defendant then drove Burke away from the scene.

The defendant also called other witnesses, including some who had previously testified for the Commonwealth, in an attempt to show various shortcomings in the police investigation.

Inasmuch as the weight and credibility of the evidence is "a matter wholly within the province of the jury," *Commonwealth* v. *Martino*, 412 Mass. at 272, "there was nothing compelling in this evidence which caused the prosecution's case to deteriorate." *Commonwealth* v. *Walker*, 401 Mass. 338, 343-344 (1987). The judge properly denied the defendant's renewed motion for a required finding of not guilty filed at the close of all the evidence.

2. *The judge's instructions on joint venture.* In his instructions to the jury on joint venture, the judge stated, among other things, that the Commonwealth must prove beyond a reasonable doubt that the defendant "aided or assisted in the commission of the crime, or stood by willing and able to help with the crime if it became necessary." In elaborating on that principle, the judge stated, "Such assistance may be provided in any of several ways. . . . Such assistance may also involve agreeing to stand by the scene of the crime at the time of the crime, to act as a look-out, or to render aid or

assistance in committing the crime, or in escaping if such help became necessary."[4]

The defendant objected to the portion of the instruction that used the words "render aid or assistance" and "escaping." On appeal, the defendant claims that the instructions were confusing and misleading because they conveyed the impression that the defendant could be found to be criminally responsible for the crime of murder even if he was not present at its commission and his actions were limited to helping Burke dispose of the body and aiding Burke to escape from the scene.

The test of a charge is the impression created by it as a whole; the court is not required to consider whether isolated portions of the charge were adequate. *Commonwealth* v. *Galford*, 413 Mass. 364, 372 (1992), cert. denied, 113 S. Ct. 1010 (1993). The judge's entire instructions on the legal principles concerning joint venture made it abundantly clear to the jury that in order to convict the defendant as a joint venturer there must be sufficient evidence demonstrating that the defendant was present at the commission of the crime with the necessary intent and knowledge and that he aided or assisted in the commission of the crime in some manner.

The defendant also claims that the judge's instructions on joint venture were flawed because of the judge's refusal to instruct the jury on the defendant's theory of the case (i.e., that he was not present at the commission of the murder and only helped Burke dispose of the body and leave the scene). In that regard, he claims error because the judge refused to

---

[4]To illustrate the legal principles involved in regard to a joint venture, the judge used an example of a bank robbery. The defendant claimed that the example was misleading because it failed to distinguish between escape after a robbery has been committed and assisting the perpetrator to escape after a homicide.

The judge made it clear that in using the example he was not talking about the facts of the case at hand. At no time did the prosecutor argue that the defendant's role was to assist an escape. *Commonwealth* v. *Levy*, 29 Mass. App. Ct. 279, 283 (1990). "[W]e think it highly unlikely that the jury were led by the judge's hypothetical to convict the defendant" on the basis that he helped Burke dispose of the body and leave the murder scene. *Id.* at 284.

give the defendant's requested instruction on the crime of accessory after the fact. The defendant concedes that accessory after the fact is not a lesser included offense of murder, but he argues that such instruction would have established a clear "distinction" between the actions that constitute joint venture and the actions that form the basis of the crime of being an accessory after the fact.

"It is to be noted, on the one hand, that the defendant was to some extent merely negating the propositions of fact as tendered and sought to be proved by the prosecution, and a negative does not lend itself readily to illustration; on the other hand, any references to the defendant's theory of the case must steer clear of the shoal of intimating that the jury must accept that theory in order to acquit him." *Commonwealth* v. *Therrien*, 371 Mass. 203, 206 (1976). See *Commonwealth* v. *Gagliardi*, 29 Mass. App. Ct. 225, 243 (1990).

The judge's instructions clearly established, among other things, that the defendant could not be found guilty of murder if his only participation consisted of helping Burke dispose of the body and assisting him to leave the scene. Therefore, any danger that the defendant would be found guilty of murder on a joint venture theory based merely on evidence that he participated in the disposition of the body "was avoided by the judge's clear and comprehensive instructions on joint venture." *Commonwealth* v. *Crowe*, 21 Mass. App. Ct. 456, 483 (1986).[5] Further, the judge could reasonably conclude that instructing the jury on a crime with which the defendant was not even charged might serve only to mislead and confuse the jury.

---

[5]The only decision that the defendant cites in support of his argument is *Sayles* v. *State*, 552 So. 2d 1383, 1390 (Miss. 1989). In that case, the court held that it was reversible error not to give an instruction on the crime of accessory after the fact because it was the only instruction that presented the defendant's theory of the case and the other instructions on joint venture "were confusing and abstract and could have led the jury to believe that it could convict Sayles based on the wrong evidence presented at trial." *Id.* at 1390. In contrast, the instructions in this matter were clear and accurately stated the applicable law, and the *Sayles* decision is not on point.

3. *The admission of photographs of the victim's body.*
The judge allowed in evidence photographs depicting the victim's body as it was discovered in the woods, covered with maggots. The defendant claims that the admission of such photographs was erroneous because they were cumulative, lacked probative value, and tended to inflame and prejudice the jury.

The Commonwealth claimed that the defendant was guilty of murder in the first degree on the ground, among others, of having committed it with extreme atrocity or cruelty. The photographs showed the position of the victim's clothing, the twenty stab wounds to her breast, and the injuries to her jaw, including fractures, lacerations, and missing teeth. The judge, after a conference with counsel, ruled that the photographs were admissible, particularly on the issue of extreme cruelty.

The defendant "carries a heavy burden" in showing that the judge abused his discretion in admitting the photographs. *Commonwealth* v. *Clifford*, 374 Mass. 293, 305 (1978). Where a "defendant is accused of committing murder with extreme atrocity or cruelty and with premeditation and deliberation," it is well settled that "photographs indicating the force applied and portraying the injuries inflicted may properly be admitted on the issue of whether the murder was committed with extreme atrocity or cruelty, as well as on the issue of premeditation and deliberation." *Commonwealth* v. *Ramos*, 406 Mass. 397, 406-407 (1990).

The fact that the photographs displayed aspects of postmortem decomposition, did not, by itself, render them inadmissible. *Commonwealth* v. *Nadworny*, 396 Mass. 342, 366-367 (1985), cert. denied, 477 U.S. 904 (1986). The photographs possessed evidentiary value in showing the nature of the wounds, "even though they also depicted some postmortem deterioration." *Commonwealth* v. *Allen*, 377 Mass. 674, 679 (1979). The judge did not abuse his discretion in allowing in evidence the photographs.

4. *The prosecutor's argument to the jury.* The defendant claims that the prosecutor, in her closing argument, improp-

erly referred to matters that were not supported by the evidence. There was no objection to the prosecutor's closing argument. "Accordingly, if there was prosecutorial error, the standard of review is whether there was a substantial risk of a miscarriage of justice." *Commonwealth* v. *Haskins*, 411 Mass. 120, 121 (1991). In addition, the absence of any objection is of importance, because it indicates that trial counsel "did not consider 'the tone, manner, and substance' of the prosecutor's statement when it was made to be harmful." *Commonwealth* v. *Stewart*, 411 Mass. at 357, quoting from *Commonwealth* v. *Toro*, 395 Mass. 354, 360 (1985).

"A prosecutor may argue the evidence and reasonable inferences which might be drawn from that evidence." *Commonwealth* v. *Amirault*, 404 Mass. 221, 238 (1989). Because the case against the defendant was based entirely on circumstantial evidence, the prosecutor devoted a considerable portion of her closing argument to the inferences that the jury might draw from the evidence (as did defense counsel). We have examined the prosecutor's entire argument. It appears clear that the "prosecutor urged the jury to reach a particular result through arguing permissible inferences from the facts presented at trial." *Commonwealth* v. *Gurney*, 413 Mass. 97, 104-105 (1992). The judge carefully instructed the jury that closing arguments are not evidence. "The [prosecutor's] argument was forceful but fair. It did not exceed the limits of propriety." *Commonwealth* v. *Haskins*, 411 Mass. at 122.

5. *The denial of the defendant's motion for a new trial.* The defendant filed a motion for a new trial on the ground that the jury were exposed to extraneous influences. The judge denied the motion in a memorandum of decision, and the defendant claims prejudicial error.

The facts are not in dispute. The jury were not sequestered during their deliberations. On a Friday afternoon the jury were dispersed with the instructions to maintain their impartiality. On Monday morning when the jury reconvened, the judge questioned the jurors in a group as to whether their impartiality had been affected over the weekend recess.

When no one responded to his inquiry, the judge ordered the jury to resume its deliberations.

Later that day, an attorney not connected with the case reported to the judge that he had received a telephone call the previous day (Sunday) from the foreperson of the jury. Before hearing the details of the communication, the judge immediately summoned the prosecutor and defense counsel to the lobby.

The lawyer told the judge and both counsel that the foreperson opened the conversation by stating that "she had some questions about the proceedings and how to further proceed in those deliberations." The lawyer informed her that he could not discuss the matter with her and that "it would be inappropriate for her to seek any sort of information or guidance beyond that which had been provided to her in the case by the lawyers and the judge." The foreperson persisted in asking the lawyer questions, and the lawyer was adamant in refusing to answer her questions.

After the lawyer concluded his recitation, the judge inquired of counsel if they had any questions. Both stated that they did not, and the lawyer was excused. The judge then offered to make inquiry of the foreperson in the presence of the defendant, unless he waived his presence.

Defense counsel indicated that he wished to talk to the defendant about the development, and he left. Over an hour later, defense counsel was summoned to the judge's lobby and told that the jury had informed the judge that they had reached a verdict. The judge inquired of counsel if he had anything to offer about the "foreperson issue." Counsel told the judge that he was not through talking to the defendant. The judge informed defense counsel that he would wait a few more minutes before he took the verdicts because he wanted counsel to resume talking to the defendant. Defense counsel left the lobby and returned in four minutes. He informed the judge that the defendant "would like to hear what the jury has to say." The defendant was brought into the courtroom and the verdicts were read in open court.

The judge denied the motion for a new trial, ruling that the "defendant was, in effect, waiving his right to have inquiry of the jurors made concerning any extraneous influence and further to have the offending juror replaced or to propose any other remedy."

On appeal, the defendant argues that the judge had numerous alternatives, such as examining the foreperson, or other jurors, or giving cautionary instructions to the jury, rather than putting the burden of choice on the defendant. We do not see any abuse of discretion by the judge, especially where there was nothing in the evidence before him that demonstrated that extraneous information reached the jury.

> *Judgments affirmed.*
> *Denial of motion for new trial affirmed.*