COMMONWEALTH *vs.* CLUB CARAVAN, INC.,
(and eighteen companion cases[1]).

No. 90-P-180.

Suffolk. November 20, 1990. - May 13, 1991.

Present: ARMSTRONG, GILLERMAN, & PORADA, JJ.

*Gaming. Video Games. Conspiracy. Practice, Criminal,* Indictment, Dismissal. *Grand Jury.*

In a criminal case involving 133 indictments for gaming offenses for conspiracies, all based on use of video poker machines, the judge properly dismissed those indictments involving play on such machines that qualified under G. L. c. 140, § 177A(1) and (2), for licensure as automatic amusement devices because an element of skill was required and the machines paid off patrons only with free plays. [563-564]

In a criminal case involving indictments for conspiracies to violate the gaming laws, the judge incorrectly allowed motions to dismiss certain of the indictments where the evidence presented to the grand jury was sufficient to allow the inference that the defendants knew their video poker machines were being used in bars and lounges for gambling purposes. [564-568]

INDICTMENTS found and returned in the Superior Court Department on December 18, 1986.

Motions to dismiss were heard by *Robert A. Mulligan,* J.

*Douglas J. Perry,* Assistant District Attorney (*James P. McKenna,* Assistant District Attorney, with him) for the Commonwealth.

*John L. Dodge* for Steven Marder.

---

[1]The companion cases include one indictment against Club Caravan, Inc. (no. 62449); one against Rogers Realty of Revere, Inc. (doing business as Shipwreck Lounge, no. 62444); six against Steven Marder (nos. 62507, 62508, 62511, 62515, 62516, and 62523); six against John S. Gattineri (nos. 62479-62484); three against Elma Corp. (doing business as Fenno's Corner Cafe, nos. 62437-62439); and one against 118 Broadway, Inc. (doing business as The Speakeasy, no. 62450).

*Charles R. Balliro*, for Rogers Realty of Revere, Inc., submitted a brief.

ARMSTRONG, J. On the defendants' motions to dismiss 133 indictments for various gaming offenses or for conspiracies, all based on video poker machines, the judge ruled that the machines were not gambling devices per se and thus dismissed nineteen indictments not based on actual use of the machines for gambling, or, in the conspiracy indictments, knowledge of such actual use by an alleged coconspirator. The Commonwealth has appealed from the dismissals.[2]

Most of the indictments were framed under G. L. c. 271, § 7, as appearing in St. 1968, c. 115, which prohibits setting up, promoting, or operating "a lottery for money or other property of value," a term that has been held to include devices such as slot machines, pinball machines, and the like. See *Commonwealth* v. *Lake*, 317 Mass. 264 (1944); *Commonwealth* v. *Rivers*, 323 Mass. 379 (1948). The latter decision held that a prize of free games constituted "other property of value." In response, the Legislature (by St. 1949, c. 361) adopted G. L. c. 140, § 177A, which authorized licensure of "automatic amusement devices," machines that enable a user to play "any game involving, in whole or in part, the skill of the player, including, but not exclusively, such devices as are commonly known as pinball machines including free play pinball machines." Subsection (6) prohibited allowing such a device to be used "for the purpose of gambling," and subsection (7) exempted machines licensed under § 177A from G. L. c. 271, § 7. The net effect of the new law was considered in *Commonwealth* v. *Macomber*, 333 Mass. 298, 300-301 (1955), which viewed an automatic game machine, so long as it involved some element of skill and rewarded the winning player only with free games or extended playing times, as not violating G. L. c. 271, § 7. See

---

[2]The Commonwealth took appeals from the dismissals of nineteen indictments but included in the appendix and argued only fourteen of those indictments. The waived appeals are those relating to indictments no. 62511 and 62523 (Steven Marder); 62481 and 62482 (John S. Gattineri); and 62439 (Elma Corp.).

also *Marshfield Family Skateland, Inc.* v. *Marshfield*, 389 Mass. 436, 441-442, appeal dismissed, 464 U.S. 987 (1983); *G.J.T., Inc.* v. *Boston Lic. Bd.*, 397 Mass. 285, 294-297 and n.18 (1986).

The judge ruled correctly that play on the video poker machines in question involved as matter of law an element of skill, thus qualifying the machines for licensure under G. L. c. 140, § 177A(1) and (2), as automatic amusement devices. The statute does not limit "skill" to physical skills, such as the hand-eye coordination or reflexes that help one playing a video action game machine (e.g., Pac-man) or a pinball machine with manual flippers. One of the Commonwealth's expert witnesses, an agent of the Federal Bureau of Investigation, had told the grand jury that a video poker machine, while it failed to utilize most of the skills that make for a good poker player (e.g., the use of bluffing, raising, throwing in a hand), nevertheless employed some element of skill (albeit "less than twenty-five percent") because it rewarded prudent calculations of the probabilities of filling in various "dealt" hands through discards and draws weighed against the known rewards if the draws should be favorable. (The rewards, shown on the face of the machine demonstrated by a State trooper, ranged from one free game for a pair of aces, the lowest winning hand, to fifty free games for a straight flush.) The State trooper's statement that the machines employed "absolutely no skill" was properly disregarded as an expert opinion in discord with the subsidiary facts on which it was based.[3] Compare *Nass* v. *Duxbury*, 327

---

[3]Trooper Naimovich's opinion was recorded on a videotape, which we have viewed. It stood on two thoughts: first, that the "skill" referred to in § 177A meant a physical skill, like manual dexterity; and, second, the absence of assurance that the circuitry of the video poker machines replicated precisely a standard fifty-two card deck. His statement that "there's nothing on here [i.e., on the machine] that's posted to tell you whether there's ten decks of cards in there, three decks, or one deck . . . [t]hat's all regulated in the circuitry here," could mean either that in a machine with more than one deck "in there," a player could be dealt the same card twice in the same hand; or that the "decks" might be stacked in ways unknown to the player, so that certain cards could appear more or less often than would be true of random deals from a fifty-two card deck. The

Mass. 396, 401 (1951); *Gladstone* v. *Treasurer & Recr. Gen.*, 337 Mass. 48, 51 (1958); *Swartz* v. *General Motors Corp.*, 375 Mass. 628, 633 (1978); *Reed* v. *Canada Dry Corp.*, 5 Mass. App. Ct. 164, 166 (1977); *Giannasca* v. *Everett Aluminum, Inc.*, 13 Mass. App. Ct. 208, 211 (1982).

Since the video poker machines involved an element of skill and ostensibly paid off winners only with free games, the judge correctly dismissed the indictments based solely on having such machines on hand for the use of patrons. The judge correctly ruled, we think, that licensed machines so used were exempt not only from G. L. c. 271, § 7, this exemption being explicit in G. L. c. 140, § 177A(7), but also from G. L. c. 271, §§ 5 and 17, seemingly overlapping statutes which in relevant part prohibit keeping a place for gaming or keeping gaming apparatus. See *Commonwealth* v. *Wetherell*, 340 Mass. 422 (1960). The purpose of § 177A, to legalize and license machines that utilize some element of skill and pay off winners only with free games, would otherwise be thwarted. See *Marshfield Family Skateland, Inc.* v. *Marshfield*, 389 Mass. at 441.

The evidence in some cases, however, showed actual use of the machines for gambling: i.e., paying off in money rather than free games. The machines were built to accommodate this. The running total of games credited to a player showed on the video screen. The total would rise by one for each quarter inserted — these could be stacked[4] — and for each game awarded as winnings; it would decline by one for each hand played, unless the player elected to bet multiple game

first would improve the odds of winning in many situations (e.g., the chance of filling in three jacks with a fourth would increase, based on two draws, from roughly two in forty-seven in a one-deck game to ten in ninety-nine in a two-deck game) but would not make calculation useless; the second would distort odds calculations predicated on a standard fifty-two card deck but, again, particularly in light of the known payoffs, would not vitiate the usefulness of calculation. Nothing in the testimony of either the F.B.I. agent or the State trooper suggested that the deals were other than random from whatever inventory of cards the machine simulated.

[4]That is, the player could insert ten quarters at the outset, and the total games to his credit would show on the screen as ten.

credits on a hand so as to multiply his potential winnings.[5] Where the machines were used for gambling, a player could cash in his accumulated game credits. The bartender would give the player twenty-five cents times the number of game credits shown on the machine, then activate a "knock-off" switch (sometimes a recessed button, sometimes a key switch, sometimes a magnetic switch operated by striking the machine in a particular spot) that would erase from the screen the total of credited games. Two meters inside a locked compartment under the machine kept track of quarters inserted (i.e., games paid for) and games knocked off. The service man from the distributor would periodically open the compartment, repay the bar or lounge for the games knocked off, and split the net proceeds (games paid for less games knocked off) with the bar or lounge. This, at least, was the pattern in the bars, lounges, or clubs where payoffs had been observed and bartenders or other employees were willing to talk. In several cases where bartenders were observed (by undercover police officers) paying off users of video poker machines the police had not witnessed, and did not have independent evidence of, reimbursements of such payoffs by the servicing company.

The judge drew the lines as follows. Where a machine was used for gambling, i.e., where there was evidence of a payoff to a customer, the judge ruled that the machine, by the express terms of G. L. c. 140, § 177A(6), was in violation of that statute and thus lacked protection from the prohibitions of the gaming laws such as G. L. c. 271, §§ 5, 7, 8, and 17. The mere keeping of such a machine (§ 5) was unlawful.[6]

---

[5]For example, a player could elect to wager, say, three game credits on a hand, thereby tripling his prize if he should draw a winning hand. A full house would thus pay thirty game credits (three times ten free games on the machine demonstrated by the State trooper). The machines were programmed to limit, usually to eight or ten, the number of game credits a player could wager on a single hand.

[6]An argument was made by the defendants below that § 17 was aimed at bookie operations, i.e., registering of bets on contests such as horseracing, dog racing, football point spreads, or numbers, rather than at slot machines or other gambling devices. The argument, rejected by the judge, is not advanced in this appeal, which concerns only indictments dismissed by

Where there was evidence of reimbursement of payoffs by the servicing company, he ruled that the grand jury had before it sufficient evidence to warrant an indictment for conspiracy between the principals of the servicing company (such as Steven Marder or John Gattineri) and the bar, lounge, or club, a conspiracy to violate the gaming laws mentioned. Where, on the other hand, there was no direct evidence of reimbursement of payoffs by the servicing company, the judge ruled the evidence of a conspiracy insufficient to warrant indictment, because there was, in his view, no evidence that the principals of the servicing company knew that the bar or lounge was using its video poker machines for gambling purposes.

Only with respect to the last ruling do we adjust the line drawn by the judge. The evidence presented to the grand jury, we think, was sufficient to allow an inference that the servicing companies are *probably* reimbursing bars that make payoffs to customers, whether or not the settling process was the subject of direct testimony. The meters in the locked compartment are specifically geared for such reimbursements, seemingly having little function other than to enable the servicing company to verify the number of game credits knocked off. There was evidence of a pattern of reimbursing bars for the payoffs before splitting the net take, and, judging by the typical weekly figures from the club (an American Legion post) where the evidence was most complete, it would make little financial sense for a bar to pay off customers for their game credits unless reimbursement were to be made from the machines' gross take.[7]

For the purpose of evaluating the factual basis for the indictments in question, this evidence sufficed. The general rule is that "[t]he court will not inquire into the competency or sufficiency of the evidence before the grand jury." *Common-*

---

the judge. We intend no ruling as to the applicability of § 17 to video poker machines.

[7]The post typically showed a gross take of $800 per week with payoffs to customers of $300 and a profit after the fifty-fifty split (with Revere Amusement Co.) of $250. A second witness said that the post's average weekly profit was $300.

*wealth* v. *Galvin*, 323 Mass. 205, 211-212 (1948). *Commonwealth* v. *Robinson*, 373 Mass. 591, 592 (1977). The function of a grand jury is not to determine the sufficiency of evidence to convict; rather, it has "the dual function of determining whether there is probable cause to believe a crime has been committed and of protecting citizens against unfounded criminal prosecutions." *Lataille* v. *District Court of E. Hampden*, 366 Mass. 525, 532 (1974). *Commonwealth* v. *McLeod*, 394 Mass. 727, 733 (1985). For example, an indictment may stand based entirely on hearsay, *Commonwealth* v. *St. Pierre*, 377 Mass. 650, 654-655 (1979), at least so long as the hearsay is reasonably reliable. *Id.* at 656. More generally, an indictment is not to be dismissed merely because "the evidence probably would not have been sufficient to overcome a motion for a required finding of not guilty at a trial." *Commonwealth* v. *O'Dell*, 392 Mass. 445, 450 (1984). *Commonwealth* v. *DeCologero*, 19 Mass. App. Ct. 956, 958 (1985). The standard of sufficiency, sometimes expressed as whether the grand jury heard "reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the defendant had committed or was committing an offense," *Commonwealth* v. *McCarthy*, 385 Mass. 160, 163 (1982); *Commonwealth* v. *DeCologero*, at 957,[8] offers no sure mechanical guide for assessing sufficiency, but it has been employed primarily to strike down indictments in cases where a grand jury has heard no evidence identifying the defendant as the perpetrator of an offense or where the grand jury has heard no evidence whatever that would support an inference of the defendant's involvement. *Commonwealth* v. *O'Dell*, *supra* at 450-451. Thus, in *Connor* v. *Commonwealth*, 363 Mass. 572 (1973), an indictment was dismissed because the grand jury had heard no evidence whatever identifying Connor as the "John Doe" who committed the crime; and in *Commonwealth* v. *McCarthy*, *supra*, the dismissal was based on the fact that the grand jury had heard no evi-

---

[8]Some States employ a concept of "probable cause to stand trial." *Commonwealth* v. *St. Pierre*, 377 Mass. at 657 n.8.

dence that suggested the defendant was more than a bystander at the place of an aggravated assault.

This is not such a case. The incorporation in the video poker machines of meters that recorded the aggregate game credits knocked off, the pattern of reimbursements by the service companies at other bars, and the inherent sense of the financial considerations, together would warrant a person of reasonable prudence in believing that the servicing companies and their principals were participating through reimbursements in the illegal enterprises of the bars and clubs that were observed using the video poker machines for gambling purposes.

The appeals from the orders dismissing indictments no. 62481, 62482, 62439, 62511, and 62523 have been waived (see note 2, *supra*) and are dismissed. The orders dismissing indictments no. 62444, 62448, 62449, 62507, 62508, 62515, and 62516 are affirmed. The orders dismissing indictments no. 62437, 62438, 62450, 62479, 62480, 62483, and 62484 are reversed, and those cases are to stand for trial.

*So ordered.*