COMMONWEALTH *vs.* AMERICO SOUSA.

No. 92-P-187.

Norfolk. September 15, 1992. - October 16, 1992.

Present: KASS, FINE, & GILLERMAN, JJ.

*Pari Mutuel Wagering. Gaming. Practice, Criminal,* Instructions to jury. *Words,* "Accepting wagers or bets."

A criminal defendant's appellate rights with respect to one aspect of the judge's jury instructions were preserved notwithstanding defense counsel's failure to renew an objection following the judge's supplemental instruction, where the issue sought to be raised on appeal had been adequately presented to the trial judge and where it was not clear that the supplemental instruction had been given in response to the objection. [436]

A defendant convicted of using a telephone for the purpose of "accepting wagers or bets" on dog races in violation of G. L. c. 271, § 17A, was entitled to a new trial where the judge's instructions as a whole did not inform the jury that if the defendant merely agreed on the telephone, without compensation or profit, to make a legal bet at a racetrack as an accommodation or favor to another, they should find the defendant not guilty. [436-439]

INDICTMENT found and returned in the Superior Court Department on June 11, 1990.

The case was tried before *John J. Irwin, Jr.,* J.

*Morris M. Goldings* (*John F. Aylmer, Jr.,* with him) for the defendant.

*Stephanie Martin Glennon,* Assistant District Attorney, for the Commonwealth.

FINE, J. After a lengthy trial on three gambling-related charges, the defendant, general manager of Wonderland Greyhound Park in Revere (Wonderland), was convicted of one offense: using a telephone for the purpose of "accepting wagers or bets" on dog races in violation of G. L. c. 271,

§ 17A.[1] He does not contend on appeal that there was insufficient evidence to justify the conviction. He contends only that the judge's instructions failed adequately to explain the requirements for conviction. We agree.

The charges arose out of a court-authorized wiretap of the home telephone of Abraham Sarkis, father of the owner of Wonderland. Numerous telephone conversations between Sarkis and others, including the defendant, were introduced in evidence. There was also evidence that Sarkis was a frequent visitor to Wonderland where he regularly placed lawful pari mutuel bets. At some point, due to illness, he was unable to attend the racetrack. On November 2, 1987, the defendant had the following telephone conversation with Sarkis:

THE DEFENDANT: "You want something?"

SARKIS: "Ah, one and one double."

THE DEFENDANT: "A what?"

SARKIS: "One and one."

THE DEFENDANT: "Okay, for how much?"

SARKIS: "Fifty, sixty make it."

THE DEFENDANT: "Six?"

SARKIS: "Sixty."

THE DEFENDANT: "Okay."

SARKIS: "Alright."

THE DEFENDANT: "Yup."

SARKIS: "Talk to ya later."

THE DEFENDANT: "Bye."

---

[1]General Laws c. 271, § 17A, as amended by St. 1962, c. 440, provides: "Whoever uses a telephone or, being the occupant in control of premises where a telephone is located or a subscriber for a telephone, knowingly permits another to use a telephone so located or for which he subscribes, as the case may be, for the purpose of accepting wagers or bets, or buying or selling of pools, or for placing all or any portion of a wager with another, upon the result of a trial or contest of skill, speed, or endurance of man, beast, bird, or machine, or upon the result of an athletic game or contest, or upon the lottery called the numbers game, or for the purpose of reporting the same to a headquarters or booking office, or who under a name other than his own or otherwise falsely or fictitiously procures telephone service for himself or another for such purposes, shall be punished by a fine of not more than two thousand dollars or by imprisonment for not more than one year."

The defendant testified that, immediately after that telephone conversation, as a favor to Sarkis, he went to the betting window at Wonderland and paid for a ticket as requested on the telephone, and that later he gave the ticket to Sarkis.

On the basis of that evidence, the defendant sought by written requests to have the judge instruct the jury, among other things, that the Commonwealth had to prove that "a bet or wager was actually placed on the telephone and the transaction was completed during the telephone conversation." In his instructions, the judge discussed the meaning of "accepting wagers or bets," as used in the statute, in general and unobjectionable terms with the possible exception of the following. He said: "The word accepting means what it ordinarily means in its most common use. It means receiving. It means *accommodating*. It means knowingly taking into your possession a bet."

After the charge was completed, counsel for the defendant objected to the judge's failure to give the requested written instruction, and he requested a further instruction that "the prosecution must prove . . . that a bet or wager was actually placed on the telephone and the transaction was completed during the telephone conversation." The judge refused, stating his view that the statute did not call for such an instruction. Referring to the evidence that the defendant was merely doing a favor for Sarkis as an accommodation, counsel also made an express objection to the instruction that equated "accepting" under the statute with "accommodating." Other objections by both parties were discussed during the conference at the bench. The judge then gave a supplemental instruction covering two of the subjects discussed. Instead of redefining the word "accepting" or discussing the word "accommodating," the judge, without referring to G. L. c. 271, § 17A, or the particular indictment to which the supplemental instruction pertained, defined the word "received." Although the judge may have intended by that instruction to convey to the jury the meaning of "accepted" in G. L. c. 271, § 17A, the word "received" appeared in a statute which was

the subject of a different indictment against the defendant. Defense counsel registered no further objection on the point before the jury retired to consider its verdict.

We first consider whether the defendant may assign as error the inadequacy of the instructions, given his failure to object following the supplemental instruction. The failure to renew an objection to a charge after a trial judge has given further instructions in response to an objection, and after apparent acquiescence in the amended charge, prevents a party from raising on appeal the issue whether the instructions were adequate. See Mass.R.Crim.P. 24(b), 378 Mass. 895 (1979); *Betty Corp.* v. *Commonwealth*, 354 Mass. 312, 321 (1968); *Commonwealth* v. *Barbosa*, 399 Mass. 841, 844 (1987). In a criminal case, however, the possibility that there might be a substantial risk of a miscarriage of justice would remain open. See *Commonwealth* v. *Levy*, 29 Mass. App. Ct. 279, 283 n.6 (1990).

While it would have been better for counsel to have voiced a further objection before the jury retired, in the particular circumstances here, we do not think counsel failed in his obligations. The issue the defendant is seeking to raise on appeal had been presented to the judge in clear terms at least twice previously, and the judge had made his position known. There was hardly, in the circumstances, apparent acquiescence by defense counsel in the amended charge. Moreover, it was unclear that the supplemental instruction, defining a word different from the one to which the objection referred, and not mentioning the particular offense to which it related, were given in response to the objection. We conclude that the issue was adequately preserved for appellate review. We need not reach the question, therefore, whether the claimed error in the charge created a substantial risk of a miscarriage of justice.

We agree with the defendant that G. L. c. 271, § 17A, should not be interpreted to make it a criminal offense for an individual to agree on the telephone, at least if he does so without compensation or profit, to make a legal bet at a race-

track as an accommodation or favor to another.[2] If the Commonwealth were correct in its interpretation of the statute as being sufficiently broad to include such conduct, then, regardless of where a telephone call is made or received and regardless of the relationship of the parties, if one, knowing the other will be attending the races, requests the other to place a legal bet for him, both would be caught within the statute's sweep.[3] So also, according to the terms of § 17A, would any person permitting his telephone to be used for such a conversation.

We see nothing in the language of the statute that compels such a result. "A bet is the hazard of money or property upon an incident by which one or both parties stand to lose or win by chance." *Commonwealth v. Sullivan*, 218 Mass. 281, 283 (1914). For one to have placed a "bet," he must have taken a risk on the uncertain outcome of a particular event and, depending on the outcome, he must be entitled to receive payment from another. "Accepting a bet" is the other side of the same coin. To "accept" a bet, one must take a risk on an uncertain event and, depending upon the outcome of the event, he must obligate himself to pay money to another person. Surely one may place or accept a completed bet over the telephone in violation of G. L. c. 271, § 17A. See, e.g., *Commonwealth v. Massod*, 350 Mass. 745, 750 (1966). If the arrangement is a mere accommodation with regard to the placement of a bet at a pari mutuel window at a racetrack, however, no bet would be in existence unless and until the bet is actually placed at the pari mutuel window. See *State ex rel. Turner v. Drake*, 242 N.W.2d 707, 709 (Iowa 1976).[4]

---

[2]We need not consider how we would have ruled had the evidence been that there was compensation or profit to the defendant or that he accommodated Sarkis in making an illegal bet.

[3]Under that interpretation of § 17A, the one asking for such a legal bet to be placed on his behalf would fall within language prohibiting "placing all or any portion of a wager with another."

[4]That one agreeing to a bet on the telephone may subsequently place the same bet at the racetrack does not necessarily preclude a finding that the bet was agreed to and, therefore, "accepted" on the telephone.

In *Commonwealth* v. *Pasquale*, 334 Mass. 669, 671 (1956), the court held that it was for the jury to decide whether a taxi driver who placed bets at a racetrack for persons unable to attend the races had "registered" the bets, within the meaning of G. L. c. 271, § 17, or had merely acted as an agent for the bettors. Whereas § 17A prohibits the use of the telephone to place or accept bets, § 17 prohibits the keeping or occupying of any place with apparatus, books, or other devices for the "registering" of bets, and the actual "registering" of bets by one present in such a place. See *Commonwealth* v. *Chagnon*, 330 Mass. 278, 282 (1953). But for the fact that the word used in § 17A is "accepting," whereas the word used in § 17 is "registering," the *Pasquale* case would be clearly dispositive of the instant one. The use of different terminology, however, might suggest that the words in the two sections have different meanings. As commonly used in the gambling context, we do not think there is a significant difference between the two terms. For both "acceptance" and "registration" of a bet, there must be a completed agreement constituting a bet. True, "registering" usually connotes a recording or notation. See *Commonwealth* v. *Clancy*, 154 Mass. 128, 134 (1891); *Sullivan* v. *Vorenberg*, 241 Mass. 319, 321 (1922). One may "register" a bet, however, by committing it to memory. See *Commonwealth* v. *Cosolito*, 359 Mass. 467, 470 (1971).

Moreover, the Commonwealth has referred us to no authority supporting its broad interpretation of the statute, and we are unaware of any likely legislative purpose that would justify it. The most obvious purpose, we think, is to prevent telephones from being used for illegal gambling. Compare Rep. A.G., Pub. Doc. No. 12 at 84, 89 (1964) (G. L. c. 271, § 17, is "aimed primarily at the professional gambler or bookmaker whose business it is to place and record such wagers"). Not only is it lawful to place a bet at a pari mutuel window located within a licensed racetrack, but such bets produce revenue for the Commonwealth. There is no statute generally preventing one from placing such a bet as an accommodation for another, whether the other is at the race-

track at the time or not, and it may be assumed that such accommodations are fairly common occurrences among racing aficionados.[5] There is nothing particularly sinister about the use of a telephone, as opposed to communicating in writing or by word of mouth, that should make its use a criminal offense if the purpose of its use is not to accomplish something illegal.

The instructions as a whole did not inform the jurors that if the defendant was merely accommodating Sarkis by placing a legal bet for him at the racetrack they should find the defendant not guilty. He is entitled, therefore, to a new trial.

*Judgment reversed.*
*Verdict set aside.*

---

[5]Included within G. L. c. 128A, § 5, as amended by St. 1968, c. 97, § 1, is the following provision: "No wagers on any race shall be received by a licensee unless they are made within the grounds . . . on the day such race is held by patrons who purchase their betting tickets at the windows or booths provided therefor." The defendant was not the "licensee."