USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT  FOR THE FIRST CIRCUIT ____________________ No. 93-1882 UNITED STATES, Appellee, v. ARTHUR M. MARDER, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Mark L. Wolf, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ ____________________ Richard J. Shea for appellant. _______________ Cynthia A. Young, Attorney, Department of Justice, with whom _________________ Donald K. Stern, United States Attorney, District of Massachusetts, ________________ and Ernest S. Dinisco, Assistant United States Attorney, were on brief _________________ for appellee. ____________________ February 2, 1995 ____________________ BOWNES, Senior Circuit Judge. Defendant-appellant, BOWNES, Senior Circuit Judge. ____________________ Arthur Marder, was convicted by a jury on all seventeen counts of the indictment against him. Twelve counts of the indictment were predicated specifically on illegal gambling allegedly in violation of Massachusetts General Laws ch. 271, 7 and 17. The counts involving the Massachusetts statutes were: two RICO counts; two counts of using interstate facilities in aid of racketeering; one count of operating an illegal gambling business; and seven counts of money laundering. There can be no doubt of the right of the federal government to base a federal crime upon the violation of a state statute. Sanabria v. United States, 437 U.S. 54, ________ _____________ 70 (1978). The five other counts charged income tax evasion (three counts), a count of conspiracy to defraud the United States by impeding the lawful functions of the IRS, and a count of illegally structuring monetary transactions. Defendant mounts three challenges to his conviction: that there were no illegal gambling offenses under the Massachusetts statutes, and that, if there were, the court's instruction on them was erroneous; that the currency transaction conviction lacked sufficient evidentiary foundation, and the court erred in its instruction on it; and that there were sentencing errors. -2- 2 Most of the essential facts are not in dispute, only the inferences and conclusions to be drawn from them. We must, of course, review the facts and all inferences to be drawn from them in the light most favorable to the government. United States v. Cotto-Aponte, 30 F.3d 4, 5 (1st _____________ ____________ Cir. 1994); United States v. Hernandez, 995 F.2d 307, 311 _____________ _________ (1st Cir.), cert. denied, 114 S. Ct. 407 (1993). _____ ______ I. ILLEGAL GAMBLING UNDER THE MASSACHUSETTS STATUTES I. ILLEGAL GAMBLING UNDER THE MASSACHUSETTS STATUTES Defendant owned and operated the Revere Amusement Company ("Revere") from 1981 to 1989. Revere's income came from the operation of video poker machines that were placed in an assortment of bars, taverns, and social clubs in Revere, Massachusetts. The poker machines operated somewhat like slot machines. The machine was activated by inserting money into it, at least a quarter. The player would then manipulate a button to obtain a poker hand. The machine's video screen would display five cards representing a poker hand. Before the "play" began, the screen displayed the payoffs for winning hands; i.e., a hand consisting of three of a kind might pay twelve to one. Credits were given for winning hands. For example, a full house might pay ten credits. After a winning player finished playing the machine, he exchanged his credits for cash. The cash payment was made by the person in charge of the establishment in which the machine(s) was located. Defendant and/or his -3- 3 employees visited the approximately seventeen places where the poker machines were located on a regular basis, usually daily. The proprietors of the establishments were reimbursed for the payoffs and then the machine's proceeds were split with them. Normally, no records were kept of the transactions. And, of course, only defendant and his employees had access to the monies paid into the poker machine. In 1985 defendant decided to enjoy the fruits of his profitable business and moved to Palm Springs, California. Defendant's son, Steven, then took over the daily operation of Revere.1 Defendant, however, kept a tight reign on Revere's operations from Palm Springs. He received between $4,000 to $10,000 in cash by express mail several times a week. At irregular intervals, he asked his employees to keep records of the transactions so he would know what was going on. Revere's income from the poker machines amounted to about $500,000 per year. There was convincing evidence that defendant made regular payoffs to local police officers, politicians, and organized crime. Neither defendant nor his company paid state or federal income tax on the income generated by the video poker game machines.  ____________________ 1. Steven Marder was indicted along with his father; he pled guilty prior to trial. -4- 4 With this factual background, we turn to the question of whether defendant's poker game business violated the implicated Massachusetts statutes. This is, of course, primarily a question of Massachusetts law. And there is no Massachusetts case directly on point. We first consider Mass. Gen. L. ch. 271, 17, which provides: 17. Place for registering bets or 17. Place for registering bets or dealing in pools; owner or occupant; dealing in pools; owner or occupant; custodian or depository custodian or depository Whoever keeps a building or room, or any part thereof, or occupies, or is found in, any place, way, public or private, park or parkway, or any open space, public or private, or any portion thereof, with apparatus, books or any _______ device, for registering bets, or buying _________________________________________ or selling pools, upon the result of a _________________________________________ trial or contest of skill, speed or _________________________________________ endurance of man, beast, bird or machine, _________________________________________ or upon the result of a game, _________________________________________ competition, political nomination, appointment or election, or whoever is present in such place, way, park or parkway, or any such open space, or any portion thereof, engaged in such business or employment; or, being such keeper, occupant, person found or person present, as aforesaid, registers such bets, or buys or sells such pools, or is concerned in buying or selling the same; or, being the owner, lessee or occupant of a building or room, or part thereof, or private grounds, knowingly permits the same to be used or occupied for any such purpose, or therein keeps, exhibits, uses or employs, or knowingly permits to be therein kept, exhibited, used or employed, any device or apparatus for registering such bets, or for buying or selling such pools, or whoever becomes the custodian or depository for hire, reward, commission or compensation in any manner, of any pools, money, property or -5- 5 thing of value, in any manner staked or bet upon such result, shall be punished by fine of not more than three thousand dollars or by imprisonment in the state prison for not more than three years, or in jail or the house of correction for not more than two and one half years. (Emphasis added.) We note first that the statute is not limited to bookmaking in the traditional sense. It includes "any device for registering bets, or buying or selling pools, upon the result of a trial or contest of skill, speed or endurance of man, beast, bird or machine, or upon the result of a game . . . ." This is broad and encompassing language. We do not think that it excludes the placing of bets on video poker games as a matter of statutory construction. Although there are no Massachusetts cases directly on point, there are three that indicate that betting on video poker games violates 17. In Commonwealth v. Club Caravan, ____________ _____________ Inc. (and eighteen companion cases), 571 N.E.2d 405 (Mass. ____ ________________________________ App. Ct. 1991), the court made several significant rulings. It upheld the ruling of the trial judge that "play on the video poker machines in question involved as a matter of law an element of skill, thus qualifying the machines for licensure under Mass. Gen. L. c. 140, 177 A(1) and (2) as automatic amusement devices." Id. at 406. The court ___ explained: Since the video poker machines involved an element of skill and ostensibly paid off winners only with -6- 6 free games, the judge correctly dismissed the indictments based solely on having such machines on hand for the use of patrons. The judge correctly ruled, we think, that licensed machines so used were exempt not only from G.L. c. 271, 7, this exemption being explicit in G.L. c. 140, 177A(7), but also from G.L. c. 271, 5 and 17, seemingly overlapping statutes which in relevant part prohibit keeping a place for gaming or keeping gaming apparatus. The purpose of 177A, to legalize and license machines that utilize some element of skill and pay off winners only with free games, would otherwise be thwarted. Id. at 407. The court noted that the trial judge ___ differentiated between video poker games and "actual use of the machines for gambling: i.e., paying off in money rather than free games," id. and drew the following line: ___ Where a machine was used for gambling, i.e., where there was evidence of a payoff to a customer, the judge ruled that the machine, by the express terms of G.L. c. 140, 177A(6), was in violation of that statute and thus lacked protection from the prohibitions of the gaming laws such as G.L. c. 271, 5, 7, 8, and 17. Id. at 407-08. The court explicitly refrained from ruling as ___ to the applicability of 17 to video poker machines. It explained: An argument was made by the defendants below that 17 was aimed at bookie operations, i.e., registering of bets on contests such as horseracing, dog racing, football point spreads, or numbers, rather than at slot machines or other gambling devices. The argument, rejected by the judge, is not advanced in this appeal, which concerns only indictments -7- 7 dismissed by the judge. We intend no _____________ ruling as to the applicability of 17 to _________________________________________ video poker machines. ____________________ Id. at 408 n.6. (Emphasis added.) ___ It was held in Commonwealth v. Boyle, 189 N.E.2d ____________ _____ 844, 846 (Mass. 1963) that, "possession of gaming apparatus anywhere is punishable" and "[t]he possession of any recorded memorandum intended to be a minute of a bet is sufficient to demonstrate a violation of either Mass. Gen. L. c. 271 7 or 17 or both of these sections, depending upon the contents of the memorandum." In Commonwealth v. Sousa, 600 N.E.2d 1012 (Mass. ____________ _____ App. Ct. 1991), the appeals court noted that, registering a bet "usually connotes a recording or notation." It also stated: "One may 'register' a bet, however, by committing it to memory." Id. at 1016. ___ We think there was sufficient evidence from which a reasonable jury could find that a video poker machine was "a device for registering bets" within the meaning of 17. After inserting the required amount of money into the machine, the player selected the number of credits - the amount he wanted to bet. The machine "registered" the bet by displaying the number of credits he had selected and set the odds on winning the poker hand dealt the player. The bets had to be registered by the machine so that the odds could be set. Moreover, the bets had to be registered on the machine -8- 8 because defendant and/or his employees determined, after opening the machine, the amount of reimbursement for payouts due the proprietors of the establishments where the machines were located. And we think it could be reasonably found that the statute included the defendant as one who sold pools "upon the result of a trial or contest of skill" . . . or "upon the result of a game." We rule, based on the evidence, the words of the statute and Massachusetts case law, that the jury could lawfully find defendant violated Mass. Gen. L. ch. 271, 17. Mass. General Laws ch. 271, 7 provides: 7. Lotteries; disposal of property by 7. Lotteries; disposal of property by chance chance Whoever sets up or promotes a lottery for money or other property of value, or by way of lottery disposes of any property of value, or under the pretext of a sale, gift or delivery of other property or of any right, privilege or thing whatever disposes of or offers or attempts to dispose of any property, with intent to make the disposal thereof dependent upon or connected with chance by lot, dice, numbers, game, hazard or other gambling device, whereby such chance or device is made an additional inducement to the disposal or sale of said property, and whoever aids either by printing or writing, or is in any way concerned, in the setting up, managing or drawing of such lottery, or in such disposal or offer or attempt to dispose of property by such chance or device, shall be punished by a fine of not more than three thousand dollars or by imprisonment in the state prison for not more than three years, or in jail or the -9- 9 house of correction for not more than two and one half years. Defendant's attack on 7 takes a different approach than his doesn't-apply challenge to 17. He acknowledges that "[a] video poker machine which pays off 'hits in cash can amount to a 'lottery' under 7." Brief at 31. His argument is that it was not proven by the government that chance predominated over skill in playing video poker and therefore there was no lottery within the meaning of 7. The Massachusetts law is reasonably clear that for there to be a lottery, chance must predominate over skill in the results of the game, or the element of chance must be present in such a manner as to thwart the exercise of skill or judgment in a game. Commonwealth v. Plissner, 4 N.E.2d ____________ ________ 241, 245 (Mass. 1936). In Commonwealth v. Club Caravan, ____________ _____________ Inc., 571 N.E.2d at 406, the appeals court held that play on ____ video poker machines "involved as [sic] matter of law an element of skill." The government contends that there was sufficient evidence for the jury to find that chance predominated over skill in playing video poker. Viewing the evidence in the light most favorable to the government, we agree. There was testimony that the machine dealt the cards electronically, although a player could choose what cards to discard. There was testimony that winning depended on the cards dealt by the machine. A hand of video poker was played before the jury in -10- 10 the courtroom. The jury could judge for themselves whether a substantial element of chance was involved. There was testimony that one hand of video poker took from two to ten seconds to play. Unless a player has a mind like a computer, this is hardly sufficient time to use poker skills. Another factor that the jury could take into consideration in determining whether video poker was a game dominated by chance or skill was the profit that defendant made. Obviously, there were a great many more losers than winners. Skill might have played a role in the video poker games operated by defendant, but it did not dominate. We rule, therefore, that the jury lawfully could find defendant to have operated a lottery that was prohibited by chapter 271, 7 of the Massachusetts General Laws. The Jury Instruction -- Waiver or Forfeiture The Jury Instruction -- Waiver or Forfeiture ____________________________________________ Defendant claims that the court erred in instructing the jury on the Massachusetts statutes relative to gambling by refusing to read the statutes in their entirety to the jury. There was no objection by defense counsel. Failure to object to a jury instruction usually means that our review is conducted under the "plain error" doctrine. In this case, however, the government argues strenuously that defendant waived any objection to the instruction and is, therefore, foreclosed from arguing the -11- 11 issue on appeal. We start our analysis by rehearsing what happened in the trial court. At the pre-charge conference the district court started to discuss the government's instruction request, number 38. This request asked that the texts of Mass. Gen. Laws ch. 271, 7 and 17 be read in full to the jury. Then followed this colloquy between the court and counsel. The prosecutor is Tuteur; defense counsel is Duggan. THE COURT: And, we will go into Government's 38. And, I don't think I am going to give this law in the description of Section 17 and 19. What I would be inclined to tell them is the following -- and, I think it may be the end of the Government's 38. MR. TUTEUR: 38-A as well. THE COURT: Well, I am inclined to tell them just what is the last paragraph of Government *38. You are instructed that the video poker machines are used for amusement purposes only by offering nothing more than the opportunity to win games. However, when the evidence indicates beyond a reasonable doubt, or proves beyond a reasonable doubt that video poker machines are used for gambling, that is, where cash payoffs are given, then Massachusetts law has been violated. Okay? MR. TUTEUR: Can I back the Court up for just a minute. On the illegal gambling business, is the Court inclined to give an instruction regarding gross revenue? THE COURT: Right. I am going to cover that. I am going to cover 38(a) on licensing and basically tell them what they want to hear. And, I think on these stipulations tomorrow that they should not focus on the license but on whether the evidence proves they were used for gambling. -12- 12 MR. DUGGAN: Back on 38 where the General Laws, Massachusetts General Laws 271 and 17 is cited, and the notion that the statute is violated where one with the intent to -- THE COURT: I just told you, I am not. I mean*, if it is true, if the last paragraph of their 38 is true,2 I am not going to tell them what 271 and 17 say. I think it is just tremendously confusing in the context of this case. Okay? MR. DUGGAN: Yes. THE COURT: I mean the key is: Have they proved beyond a reasonable doubt that they are used for gambling, that you get money for games? That is a crime, there is no dispute under state law on that. The rest of this stuff is just -- It is the government's contention that defense counsel's (Duggan) answer "Yes" to the court's question, "Okay?" was an acceptance and approval of the instruction and, therefore, he cannot raise the issue on appeal. The most authoritative case on waiver and forfeiture under Fed. R. Crim. P. 52(b) is United States v. ______________ Olano, 113 S. Ct. 1770 (1993). The Court pointed out: _____ Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the "intentional relinquishment or abandonment of a known right." . . . Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake. . . . Mere  ____________________ 2. The last paragraph of government's request number 38 is not in the record. We do not think it is necessary for understanding the issue. -13- 13 forfeiture, as opposed to waiver, does not extinguish an "error" under Rule 52(b). . . . If a legal rule was violated during the District Court proceedings, and if the defendant did not waive the rule, then there has been an "error" within the meaning of Rule 52(b) despite the absence of a timely objection. Id. at 1777 (citations and quotations omitted). ___ Our survey of the cases in this esoteric procedural corner of the federal law convinces us that defendant did not waive the issue. In United States v. Lakich, 23 F.3d 1203 _____________ ______ (7th Cir. 1994), counsel had overnight to think how the jury should be instructed in response to its question about entrapment. The next morning the court, after eliciting comments from counsel, read its proposed instruction to them. Both counsel explicitly agreed to the court's instruction. The court of appeals held that under these circumstances defendant had waived any objections to the instruction. Id. ___ at 207-08. Lakich is a far cry from the case before us. In ______ the instant case the court cut off defense counsel's question before it was finished. It is difficult to determine just what defense counsel was going to ask, particularly in light of the fact that it was the government that requested the Massachusetts statutes be read in their entirety to the jury. For aught we know, defense counsel was simply agreeing that the statutes were confusing. Or perhaps he thought it -14- 14 prudent to simply say, "Yes" and move on. In any event, we think the attempted colloquy between defense counsel and the court is too thin a peg on which to hang a finding of waiver. This case clearly does not fall within the ambit of waiver resulting from a tactical decision not to object. See ___ United States v. Mihm, 13 F.3d 1200, 1204 (8th Cir. 1994); ______________ ____ United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991). _____________ ______ We are also reluctant to find a waiver in these circumstances because the cases in our own circuit send out conflicting signals. In United States v. Rojo-Alvarez, 944 _____________ ____________ F.2d 959, 971 (1st Cir. 1991), we held that there was a waiver when, after the court reworded an instruction in response to defendant's objection, defense counsel stated he was satisfied with the reworded instruction. Even assuming that this is the law of the circuit,3 there was no direct inquiry from the court in the instant case nor an unequivocal assent to the instruction by defense counsel. There are two prior cases in this circuit that cut the other way. In United States v. Espinal, 757 F.2d 423, 426 (1st Cir. 1985), ______________ _______ we held: "When a charge is given as requested by counsel, the defects, if any, must rise to the level of plain error affecting substantial rights in order to justify reversal." There was no mention of waiver. In United States v. Drougas, _____________ _______ 748 F.2d 8, 30 (1st Cir. 1984), we held that defense  ____________________ 3. Rojo-Alvarez was not an en banc opinion. ____________ _______ -15- 15 counsel's explicit approval of an instruction bars any objection except upon the grounds of plain error. These two cases appear to be somewhat at odds with United States v. _____________ Kakley, 741 F.2d 1, 3 (1st Cir. 1984), which held that ______ requesting an instruction that is given amounts to "invited error," and whatever error occurred may not be raised on appeal. All of the cases cited in this paragraph were decided prior to Olano. This panel regards the question as _____ open. Because of the uncertainty as to whether defense counsel had explicitly approved the instruction and in light of the conflicting decisions of this circuit, we decline to finda waiverhere. We, therefore,turn toa plainerror analysis. United States v. Olano, 113 S. Ct. 1770, considers _____________ _____ in detail the doctrine of plain error under Fed. R. Crim. P. 52(b). Its teaching may be capsulized as follows: "'Plain' is synonymous with 'clear' or, equivalently, 'obvious.'" Id. ___ at 1777. The requirement of Rule 52(b) that the error affect substantial rights "means that the error must have been prejudicial: It must have affected the outcome of the District Court proceedings." Id. at 1778. And "[i]t is the ___ defendant rather than the Government who bears the burden of persuasion with respect to prejudice." Id. Correcting plain ___ error should be made where "a miscarriage of justice would otherwise result." This "means that the defendant is -16- 16 actually innocent . . . but we have never held that a Rule 52(b) remedy is only warranted in cases of actual innocence." ____ Id. at 1779. The standard that guides the correction of a ___ plain error is whether the error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" Id. (quoting United States v. Atkinson, 297 ___ _____________ ________ U.S. 157, 160 (1936)). In United States v. Whiting, 28 F.3d 1296, 1309 _____________ _______ (1st Cir. 1994), we assumed that the error affected substantial rights, but found that the error neither caused a miscarriage of justice nor seriously affected the fairness, integrity or public reputation of the judicial proceeding. We need not go that far at this juncture. We have carefully reviewed the trial record and find that the district court's refusal to read the full text of each statute did not rise to the level of plain error because it did not affect the outcome of the trial. It was not prejudicial and did not affect substantial rights as those terms are defined in Olano. This ruling is not intended to _____ suggest that the instruction as given was error, plain or otherwise. II. THE ILLEGAL STRUCTURING II. THE ILLEGAL STRUCTURING Defendant asserts error in his conviction under 31 U.S.C. 5322(b) and 5324(c), which proscribe the structuring of currency transactions to evade the regulatory -17- 17 and statutory requirement that banks report to the IRS all currency transactions in amounts greater than or equal to $10,000. Citing Ratzlaf v. United States, 114 S. Ct. 655 _______ _____________ (1994), which held that conviction under these statutes requires proof "that the defendant acted with knowledge that his conduct was unlawful," id. at 657 (interpreting meaning ___ of statutory term "willful"), defendant argues that the instructions given at his trial did not require the jury to make the elemental determination that he knew the structuring in which he was engaged was unlawful in order to convict him.4 Conceding that he did not interpose a contemporaneous objection at trial, defendant contends that the erroneous instructions constitute plain error, see Fed. R. Crim. P. ___  ____________________ 4. Ratzlaf was decided after the trial of this case but _______ prior to appellate argument. -18- 18 52(b), and require reversal of his structuring conviction.5 In light of the teaching of Ratzlaf, we think it _______ clear that error was committed here. The willfulness  ____________________ 5. In his reply brief, defendant raises a belated argument that we should apply an unspecified "more favorable" reviewing standard in assessing his challenge to the structuring conviction. In defendant's view, his failure to object to the structuring instructions given at his trial was excusable because Ratzlaf had not yet been handed down and _______ because all of the circuits which had then issued opinions on the meaning of the term "willful" in the context of the anti- structuring statute had defined it in a manner consistent with the district court's instructions. Thus, defendant contends, the law "did not support a request for the instruction later mandated in Ratzlaf." _______ Even if we were to view this argument as properly before us, cf. Sandstrom v. Chemlawn Corp., 904 F.2d 83, 86 ___ _________ ______________ (1st Cir. 1990) (deeming waived, in a civil case, an argument not made in appellant's opening brief), we would not find excusable defendant's failure to object to the now-challenged instructions. At the time of defendant's trial, settled law in this circuit foreshadowed the Supreme Court's conclusion in Ratzlaf that a conviction for structuring requires proof _______ that defendant acted with knowledge that his conduct was unlawful. See United States v. Bank of New England, N.A., ___ _____________ __________________________ 821 F.2d 844, 854 (1st Cir.) ("A finding of willfulness under the Reporting Act must be supported by proof of the defendant's knowledge of the reporting requirements and his specific intent to commit the crime.") (citations omitted) (interpreting the meaning of 5322's willfulness provision in a context other than 5324's anti-structuring provisions), cert. denied, 484 U.S. 943 (1987). Moreover, at _____ ______ this same time, we had withdrawn an opinion and reheard en __ banc a case which raised the precise question eventually ____ decided in Ratzlaf: the meaning of 5322's willfulness _______ provision in the anti-structuring context. See United States ___ _____________ v. Donovan, No. 91-1574 (1st Cir. Feb. 6, 1992), reh'g en _______ _____ __ banc granted, opinion withdrawn, (1st Cir. Mar. 18, 1992), ____ _______ _______ _________ opinion reissued as redacted, 984 F.2d 493 (1st Cir. 1993), _______ ________ __ ________ cert. granted and judgment vacated, 114 S. Ct. 873 (1994). _____ _______ ___ ________ _______ In light of this authority and these events, of which defendant should have been aware, defendant's argument that his failure to object was excusable rings hollow. -19- 19 requirement of 5322 and 5324 demands a jury finding that the defendant knew that the structuring in which he was engaged was unlawful. See Ratzlaf, 114 S. Ct. at 663. ___ _______ Defendant's jury was not, however, instructed to make this elemental determination in order to convict. In relevant part, the trial court instructed the jury: [T]o prove this offense the Government has to prove beyond a reasonable doubt that the defendant knew each [of the banks] are required to file a currency transaction report. A person structures a transaction if he . . . intended to evade the requirement. [T]he Government has to prove . . . this was done willfully, that is, that the defendant knew of the reporting requirement and that the structuring had the purpose of evading that requirement. Finally, the Government has to prove that the defendant in the process of structuring this transaction . . . was also violating another law of the United States in connection with that. Thus, the jury was told that conviction was proper if it found that defendant knew of the reporting requirement, acted to evade it, and violated some other law of the United States in so acting. The instructions were not tantamount to charging that in order to convict, the jury must find that defendant knew that acting to evade the reporting requirement -20- 20 was unlawful.6 The absence of such an instruction constitutes a clear violation of the defendant's due process right to have the prosecution persuade the fact-finder beyond a reasonable doubt of the facts necessary to establish each ____ element of the offense charged, and defendant's Sixth _______ Amendment right to a jury trial. Sullivan v. Louisiana, 113 ________ _________ S. Ct. 2078, 2080-81 (1993) (collecting cases) (the Sixth Amendment jury-trial right carries within it a right to have the jury find, beyond a reasonable doubt, all of the facts ____ necessary to establish each element of the offense charged). While the question whether error occurred here is rather easily answered in hindsight, the questions whether  ____________________ 6. Noting that jury instructions are not to be reviewed in isolation, but rather "in the context of the overall charge," Cupp v. Naughten, 414 U.S. 141, 147 (1973), the government ____ ________ contends that a general instruction on willfulness given elsewhere in the charge was sufficient to have conveyed to the jury the appropriate structuring mens rea requirement. ____ ___ The instruction on which the government relies provided: "And, for all of the counts except the tax evasion count which has a different definition of willfulness, the concept of willfulness means that somebody has acted willfully, that he acted knowingly and not by accident or mistake, and deliberately in violation of a known legal duty." In our view, this instruction cannot be viewed as having cured any error in the specific structuring instruction. While the general willfulness instruction stated that the defendant had to have acted in violation of some known legal duty, it does not explicitly inform the jury that the defendant had to know that structuring itself was illegal. Furthermore, by indicating that willfulness means something different in the structuring and tax evasion contexts (the latter of which differs from most other criminal law areas by requiring specific knowledge that the conduct at issue was criminal), the jury could have inferred that the actual knowledge of illegality required in the tax evasion context was not required in the structuring context. ___ -21- 21 the second and third prerequisites to reversal under Rule 52(b) -- i.e., whether the error was plain and affected defendant's substantial rights -- are considerably more complicated. Although the challenged instructions are clearly incorrect in light of Ratzlaf, Ratzlaf was not _______ _______ decided at the time of defendant's trial. Moreover, the great weight of then-existing authority indicated that actual knowledge of the illegality of structuring by the defendant was not a precondition to conviction. See Ratzlaf, 114 S. ___ ___ _______ Ct. at 665 (collecting cases). Thus, this case raises an issue that the Olano court explicitly reserved: "We need not _____ consider the special case where the error was unclear at the time of trial but becomes clear on appeal because the applicable law has been clarified." Olano, 113 S. Ct. at _____ 1777; but see United States v. Frady, 456 U.S. 152, 163 ___ ___ ______________ _____ (1982) ("By its terms, recourse may be had to [Rule 52(b)] only on appeal from a trial infected with error so 'plain' ____ the trial judge and prosecutor were derelict in countenancing it, even absent defendant's timely assistance in detecting it.") (dictum) (emphasis supplied).  ______ This issue has engendered a split in the circuits since the Olano decision. Compare, e.g., United States v. _____ _______ ____ _____________ Calverley, 37 F.3d 160, 162-63 (5th Cir. 1994) (en banc) _________ __ ____ (error must be clear or obvious at time of trial); United ______ States v. Washington, 12 F.3d 1128, 1138 (D.C. Cir.) (same), ______ __________ -22- 22 cert. denied, 115 S. Ct. 98 (1994); with United States v. _____ ______ ____ _____________ Viola, 35 F.3d 37, 42 (2d Cir. 1994) (Rule 52(b) can be _____ invoked even where the error was not clear or obvious at the time it was committed); United States v. Retos, 25 F.3d 1220, _____________ _____ 1230 (3d Cir. 1994) (same); United States v. Jones, 21 F.3d _____________ _____ 165, 172 (7th Cir. 1994) (same). In addition, the question whether the error affected the defendant's substantial rights is not without controversy. Olano made clear that substantial rights have _____ been affected only where there has been prejudice to defendant, and then confirmed that the Rule 52(b) prejudice inquiry is indistinguishable from ordinary, harmless-error review except for the fact that the burden of proof is upon the defendant. 113 S. Ct. at 1777-78. In the present context, this gives rise to a problem we recently noted: contemporary Supreme Court cases suggest two separate modes of harmless-error analysis where the challenged error is a jury instruction that misdefines (or omits) an element of the offense charged. Whiting, 28 F.3d at 1309 and n.12 _______ (collecting cases). One mode would look to whether there was sufficient record evidence to establish the unfound element; the other would look only to whether the jury made findings functionally equivalent to the missing finding. Id.; see ___ ___ also Ortiz v. Dubois, 19 F.3d 708, 717-18 (1st Cir. 1994) ____ _____ ______ (Stahl, J., dissenting) (explicating latter inquiry in the -23- 23 habeas context), cert. denied, ___ S. Ct. ___ (U.S., Jan. 9, _____ ______ 1995) (No. 94-5650). As one might imagine, the determination of harmlessness vel non is often different under these two ___ ___ modes of analysis. Neither of these two issues need be resolved in this case. Even if we find that the error here was plain and affected defendant's substantial rights, we may not respond to it unless it "seriously affects the fairness, integrity or public reputation of judicial proceedings." Olano, 113 S. _____ Ct. 1778-79. In this case, we think that the error cannot be viewed as having seriously compromised any of these three values. First, there is relatively little risk that the error resulted in the miscarriage of justice engendered by the conviction of an innocent man. Olano, 113 S. Ct. at _____ 1779. Although there is no direct evidence in the record that defendant knew of the illegality of structuring, we previously have recognized that willfulness, as a state of mind, can rarely be proved by such evidence; instead, "it is usually established by drawing reasonable inferences from the available facts." Bank of New England, 821 F.2d at 854; see ___________________ ___ also Ratzlaf, 114 S. Ct. at 663 n.19. Here, any claim of ____ _______ lack of knowledge of the illegality of structuring tends to be belied by defendant's conduct. The evidence shows that, on February 18, 1987, defendant's then-wife, Lynne Marder, -24- 24 acting at defendant's behest, used cash to purchase $11,460 worth of cashier's checks in amounts of $5,000, $3,960, and $2,500 from three separate banks in Derry, New Hampshire. While it certainly would make sense for a person cognizant of the reporting requirement but unaware of the illegality of structuring to make two separate purchases at two separate ___ banks -- e.g., a purchase of $5,000 and a purchase of $6,460 -- in order to obtain $11,460 without triggering a report to the IRS, the fact that defendant instructed his wife to make three separate purchases at three separate banks suggests _____ that defendant had a purpose beyond evasion of the reporting requirement: concealment of his structuring. And proof of concealment tends to prove knowledge of illegality. See ___ United States v. Sorrentino, 726 F.2d 876, 880 (1st Cir. ______________ __________ 1984) (citing Holland v. United States, 348 U.S.121, 125 _______ _____________ (1954)). Moreover, our circuit has recently ruled that jury instructions misdescribing or failing to describe an element of the offense do not per se seriously affect the fairness, ___ __ integrity or public reputation of judicial proceedings. Whiting, 28 F.3d at 1309-10 (declining to find plain error in _______ a jury instruction which allowed the jury to convict a defendant for receipt or possession of an unregistered firearm without making the elemental determination that the weapon in question was a "firearm" within the meaning of the -25- 25 statute). While we in no way disparage the importance of the due process and Sixth Amendment rights that may be undermined when jury instructions misdescribe or fail to describe an element of the offense charged, we simply do not think that a deprivation of these rights in all circumstances is so __ ___ _____________ "shocking," as to require automatic reversal even where the defendant has failed to bring the error to the attention of the trial judge. See United States v. Griffin, 818 F.2d 97, ___ _____________ _______ 100 (1st Cir.) (describing errors suitable for reversal under plain error doctrine), cert. denied, 484 U.S. 844 (1987). _____ ______ On the civil side we recently held, following circuit precedent, that: The "plain error" rule "'should be applied sparingly and only in exceptional cases or under peculiar circumstances to prevent a clear miscarriage of justice.'' Wells Real Estate, 850 F.2d at 809 ___________________ (quoting Nimrod v. Sylvester, 369 F.2d ____________________ 870, 873 (1st Cir. 1966)); see Elgabri, ___ _______ 964 F.2d at 1259. Under the "plain error" exception, an erroneous instruction warrants a new trial only where the error "seriously affected the fairness, integrity or public reputation of the judicial proceedings." See Lash ___ ____ v. Cutts, 943 F.2d 147, 152 (1st Cir. ________ 1991); Smith, 877 F.2d at 1110. _____ Poulin v. Greer, 18 F.3d 979, 982 (1st Cir. 1994). ______ _____ Finally, we do not think that the challenged instructions, in light of the particulars of this case, warrant an exercise of our discretion to determine whether the error "seriously affect[s] the fairness, integrity or -26- 26 public reputation of judicial proceedings." Olano, 113 S. _____ Ct. at 1779. Our recent decision in Whiting, which is _______ binding on us, undergirds this conclusion. While the evidence of the omitted element is certainly less strong here than it was in Whiting, see Whiting, 28 F.3d at 1309 _______ ___ _______ (documenting the overwhelming record evidence that the weapon in question was indeed a "firearm" within the meaning of the statute), it is, as we have noted, not insubstantial. Furthermore, the error here was far more excusable than in Whiting. At the time the defective instructions were given, _______ they were in accord with the law of every circuit that had issued an opinion on the meaning of the anti-structuring statute's willfulness provision. Thus, we simply do not believe that they can reasonably be viewed as having caused the type of error which calls into serious question the fairness, integrity or public reputation of judicial proceedings. See United States v. Figueroa, 976 F.2d 1446, ___ _____________ ________ 1456 (1st Cir. 1992) (ruling that any error in the trial court's failure to admit evidence of a cooperating witness's criminal record for impeachment purposes did not seriously affect the fairness, integrity or public reputation of judicial proceedings in view of the conflict regarding the admissibility of such evidence among the circuits and the absence of on-point First Circuit precedent), cert. denied, _____ ______ 113 S. Ct. 1346 (1993). To be sure there are cases from -27- 27 other circuits to the contrary. See Retos, 25 F.3d at 1232 ___ _____ (concluding without analysis that a defective willfulness instruction given prior to Ratzlaf in a structuring case _______ seriously affects the fairness, integrity or public reputation of judicial proceedings); Jones, 21 F.3d at 173 _____ (same); United States v. Rogers, 18 F.3d 265, 268 (4th Cir. _____________ ______ 1994) (same). We recognize that these other circuits may well have a valid rationale for their view, but we are bound by our own precedent. Furthermore, we think that it is the better solution to this problem. In sum, we decline to vacate defendant's structuring conviction under the plain error doctrine. III. THE SENTENCING III. THE SENTENCING No transcript of the sentencing hearing has been furnished us. We do not know whether it has been lost in transit or one was not requested. Although a transcript would have been helpful, the issues raised by defendant can be competently decided without one. In its judgment and conviction order, the court followed the procedure set forth in U.S.S.G. 5G1.2, which provides in pertinent part: 5G1.2. Sentencing on Multiple Counts 5G1.2. Sentencing on Multiple Counts _______________________________ of Conviction of Conviction _____________ (c) If the sentence imposed on the count carrying the highest statutory maximum is adequate -28- 28 to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise re-quired by law. 7  ____________________ 7. See United States v. Quinones, 26 F.2d 213, 215-17 (1st ___ _____________ ________ Cir. 1994), for a discussion of the district court's discretion to order that sentences be served consecutively notwithstanding the dictates of U.S.S.G. 5G1.2. This is not an issue in this case. -29- 29 The commentary to 5G1.2 explains: This section specifies the procedure for determining the specific sentence to be formally imposed on each count in a multiple-count case. The combined length of the sentences ("total punishment") is determined by the adjusted combined offense level. To the extent possible, the total punishment is to be imposed on each count. Sentences on all counts run concurrently, except as required to achieve the total sentence, or as required by law. This section applies to multiple counts of conviction (1) contained in the same indictment or information, or (2) contained in different indictments or informations for which sentences are to be imposed at the same time or in a consolidated proceeding. Usually, at least one of the counts will have a statutory maximum adequate to permit imposition of the total punishment as the sentence on that count. The sentence on each of the other counts will then be set at a lesser of the total punishment and the applicable statutory maximum, and be made to run concurrently with all or part of the longest sentence. If no count carries an adequate statutory maximum, consecutive sentences are to be imposed to the extent necessary to achieve the total punishment. The district court sentenced the defendant to 140 months incarceration, which was in accord with the Guidelines Sentencing Range, on his RICO and Money Laundering counts (1, 2, 4-10), "to be served concurrently on each other." The balance of the sentence was as follows: -30- 30 120 months on each of counts 19 & 20 to be served concurrently on each other as well as on counts 1, 2, 4-10; 60 months on each of counts 3,11,12, 16- 18, to be served concurrently on each other as well as on counts 1,2,4-10 and counts 19 & 20. Defendant does not object to the overall sentence. He does argue that the court erred in imposing a sentence of 120 months on Counts 19 & 20 (conspiracy to defraud the IRS and structuring) and 60 months on Counts 16-18 (tax evasion). In his reply brief defendant acknowledges that the sentences on Counts 16-18 "lawfully reached the statutory maximum" because of the provisions of U.S.S.G. 5G1.2 and its commentary. He therefore concedes that his attack on the sentences on counts 16-18 is contingent on reversal of the judgment on those counts carrying the 140-month sentence. Because this contingency has not occurred, the attack on the sentences for counts 16-18 fails. As the government points out, however, the court erred in sentencing defendant to a concurrent sentence of 120 months on Count 19 for conspiring to defraud the United States. The applicable statute, 18 U.S.C. 371, provides for a fine of not more than $10,000 or imprisonment of not more than five years, or both. Defendant's sentence on this count should have been a concurrent sentence of sixty months. We must remand to the district court for a correction of the -31- 31 sentence on Count 19. In all other respects, the sentence of defendant is upheld. Remanded for correction in sentencing; the judgment Remanded for correction in sentencing; the judgment ___________________________________________________ of the district court is in all other respects  of the district court is in all other respects  ______________________________________________ Affirmed.  Affirmed. _________ -32- 32